In the Matter of the Requested Extradition of Joseph Patrick Thomas DOHERTY by the GOVERNMENT OF the UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND.

No. 83 Cr. Misc. 1.

United States District Court,
S.D. New York.

Dec. 12, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., New York City, for petitioner; Thomas E. Moseley, Sp. Asst. U.S. Atty., New
York City, of counsel.

Somerstein & Pike, New York City, for respondent; Mary Boresz Pike, Stephen A. Somerstein, New York City, of counsel.

SPRIZZO, District Judge:

Petitioner United States of America, acting on behalf of the United Kingdom of Great Britain and Northern Ireland, has requested the extradition to the United Kingdom of respondent Joseph Patrick Thomas Doherty. This request is made pursuant to 18 U.S.C. § 3184 and the Treaty of Extradition between the United States of America and the United Kingdom of Great Britain and Northern Ireland, 28 U.S.T. 227, T.I.A.S. No. 8468 (effective Jan. 21, 1977) ("the Treaty"). The Government of the United Kingdom seeks Doherty's extradition on the basis of his conviction in Northern Ireland on June 12, 1981 for murder, attempted murder, and illegal possession of firearms and ammunition, and for offenses allegedly committed in the course of his escape from H.M. Prison, Crumlin Road, Belfast, on June 10, 1981.

Doherty was arrested by the United States Immigration and Naturalization Service on June 18, 1983, in New York City. A provisional warrant of arrest was issued by Chief Judge Constance Baker Motley on June 27, 1983, pursuant to Article VIII of the Treaty. A formal request for extradition was filed in accordance with Article VII of the Treaty in the Southern District of New York on August 16, 1983. A hearing was held by the Court in March and April 1984 pursuant to 18 U.S.C. § 3184.

The facts of this case are not in substantial dispute. The incidents giving rise to the extradition request are briefly as follows. Respondent Doherty was a member of the provisional Irish Republican Army ("PIRA"). On May 2, 1980, at the direction of the IRA, Doherty and three others embarked upon an operation "to engage and attack" a convoy of British soldiers. Transcript of Hearing ("Tr.") at 631.

Doherty testified that he and his group took over a house at 371 Antrim Road in Belfast, and awaited a British Army convoy. Some three or four hours later, a car stopped in front of 371 Antrim Road and five men carrying machine guns emerged. These men, members of the Special Air Service of the British Army ("SAS"), and Doherty's group fired shots at each other.

In the exchange of gunfire Captain Herbert Richard Westmacott, a British army captain, was shot and killed. Doherty was arrested, charged with the murder, among other offenses, and held in the Crumlin Road prison pending trial. On June 10, 1981, after the trial was completed but before any decision by the Court, Doherty escaped from the prison along with seven others. He was convicted *in absentia* on June 12, 1981 of murder, attempted murder, illegal possession of firearms and ammunition, and belonging to the Irish Republican Army, a proscribed organization.

Pursuant to Article IX of the Treaty, the Court must be satisfied that probable cause exists with respect to the offenses for which the requesting party seeks Doherty's extradition. *See Sidona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980). Petitioner produced a Certificate of Conviction for the offenses related to the death of Captain Westmacott, and a Warrant for Arrest of Doherty with respect to the escape from the Crumlin Road prison. *See* Request for Extradition. Doherty has not contested that he is, in fact, the person named in those documents, or named as respondent herein. Indeed, he testified as to his involvement in both the May 2, 1980 incident which resulted in the death of Captain Westmacott and the June 10, 1981 prison escape. *See* Tr. at 631–45, 654–67. Therefore, the Court finds that probable cause clearly exists.

Doherty asserts that the extradition request must be denied, however, pursuant to Article V(1)(c)(i) of the Treaty, which provides:

(1) Extradition shall not be granted if:

\*    \*    \*    \*    \*    \*

(c)(i) the offense for which extradition is requested is regarded by the requested Party as one of a political character; ...

Petitioner denies that this so-called "political offense" exception to the Treaty is applicable in this case. The Court must determine, therefore, whether the offenses for which Doherty was convicted in relation to the May 2, 1980 incident, and those for which he is accused in connection with the escape from prison, are of a political character.

It seems clear, as the evidence established, that the centuries old hatreds and political divisions which were spawned by England's conquest of Ireland in medieval times continue to resist any permanent resolution. Instead they have smoldered, sometimes during long periods of quescience, only to repeatedly erupt with tragic consequences. The offenses which give rise to this proceeding are but the latest chapters in that unending epic. *See In Re Mackin,* 80 Cr.Misc. 1, p. 54 at 49–74 (S.D. N.Y. Aug. 13, 1981), *appeal dismissed,* 668 F.2d 122 (2d Cir.1981).

The Provisional Irish Republican Army, of which respondent is a member, claims to be a contemporary protagonist in that ancient struggle. The evidence established that the Irish Republican Army and more particularly the PIRA, had for a time lost much public support and had indeed become dormant, while other groups, emulating the pattern of civil rights groups in this country, sought to achieve an amelioration of alleged political and economic depriva-

tions by peaceful means. It is indeed unfortunate that those efforts failed, but fail they did. Perhaps, given the long standing enmities, anxieties, and fears that exist between the Unionists and Republicans in Ireland, it was too much to expect that they would succeed. Nevertheless it was the collapse of those peaceful efforts that ironically led to a resurgence of the PIRA.

On January 30, 1972 in Londonderry, what started out as a peaceful demonstration ended in a bloody confrontation in which 13 civilians were killed. *See* Tr. at 61, 133–34. Since British troops were regarded as at least in part responsible for that tragedy, their presence which had been initially welcomed, became a subject of increasing antipathy and concern.[1] The result was a fresh impetus for the PIRA, and increasing support for those who would resolve Ireland's political problems by violence.[2]

Following the resurgence of the PIRA, the level of violence both by the PIRA and armed Loyalist groups continued to escalate in a continuing and seemingly inexorable series of events that between 1972 and 1979 claimed the lives of over 1,770 persons, nearly 1,300 of whom were civilian casualties, and injured hundreds of others. *See* Review of the Operation of the Northern Ireland (Emergency Provisions) Act 1978 (the "Baker Report") (P.Ex. 18) at 152; *see also* New Ireland Forum, The Cost of Violence arising from the Northern Ireland Crisis since 1969 (R.Ex. UU) at ¶ 2.1. This alarming and at times wanton destruc-

---

1. It was clear from the testimony that by August 1969, a state of civil disorder had been reached that had threatened the viability of the Northern Irish government. As a consequence, the Prime Minister requested assistance from the United Kingdom and British troops were sent to maintain order. It is also clear that they were initially well received. *See* Tr. at 60, 130–31.

2. While the Court is not persuaded that the methods and objectives of the PIRA are in fact shared by a majority of the people in Ireland, or indeed by a majority of the Catholics in Northern Ireland, that circumstance is not dispositive of the issue of whether respondent, as a member of that group, is entitled to rely upon the political offense exception to the Treaty. In-

deed, at the time of the American Revolution, there were a large number of colonists who not only desired a continued union with England, but regarded the thought of armed opposition to the Crown as both treasonous and abhorrent. *See, e.g.,* J.R. Alden, *The American Revolution 1775–1783* (1954); S.E. Morison, *The Oxford History of the American People* (1905); C.H. Van Tyne, *Loyalists in American Revolution* (1902). Many loyalists suffered the consequences of these beliefs both before and after independence. Given the nature of that history it would indeed be anomolous for an American court to conclude that the absence of a political consensus for armed resistance in itself deprives such resistance of its political character.

tion of life and property necessitated the enactment of special laws, *see* Northern Ireland (Emergency Provisions) Act 1973 (R.Ex. BB); Prevention of Terrorism (Temporary Provisions) Act 1976 (R.Ex. CC); Northern Ireland (Emergency Provisions) Act 1978 (R.Ex. DD); *see also* Report of the Commission to consider procedures to deal with terrorist activities in Northern Ireland (the "Diplock Report") (R.Ex. AA); Suppression of Terrorism Act 1978 (P.Ex. 15), including the creation of special Diplock Courts to try political offenders, and transformed the Catholic areas of Belfast and Londonderry into zones of military occupation.

Were the Court persuaded that all that need be shown to sustain the political offense exception is that there be a political conflict and that the offense be committed during the course of and in furtherance of that struggle, the respondent would clearly be entitled to the benefits of that exception. However, that conclusion is but the beginning and not the end of the analysis that must be made to determine whether in fact Doherty may be properly extradited.

While it is true that some of the older English cases, *see, e.g., In re Meunier* [1894] 2 Q.B. 415, 419; *In re Castioni* [1891] 1 Q.B. 149, 156, 159, 166, and some of the American cases that have relied upon them, *see, e.g., In re Mackin, supra,* 80 Cr.Misc. 1 at 24–25; *In re Gonzalez,* 217 F.Supp. 717, 720–21 (S.D.N.Y.1963); *In re Ezeta,* 62 F. 972, 999 (N.D.Cal.1894), have assumed that that is all that need be shown, such an approach is hardly consistent with either the realities of the modern world, or the need to interpret the political offense exception in the light of the lessons of recent history. Nor is it reflective of the more recent English precedents which have, relying upon that experience, adopted a more restrictive view of that exception, *see, e.g., Regina v. Governor of Pentonville Prison, Ex parte Cheng* [1973] W.L.R. 746, 753; *Regina v. Governor of Brixton Prison, Ex parte Schtraks* [1964] A.C. 556, 591–92, a view shared by at least one American court. *See Eain v. Wilkes,* 641 F.2d 504, 518–21 (7th Cir.1981), *cert.*

*denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). *But see Karadzole v. Artukovic,* 247 F.2d 198, 204–05 (9th Cir. 1957), *aff'g, Artukovic v. Boyle,* 140 F.Supp. 245 (S.D.Calif.1956), *vacated,* 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1958); *Quinn v. Robinson,* No. C–82–6688 RPA, slip op. at 22–23, 29–32 (N.D.Cal. Oct. 3, 1983), *appeal pending,* 83–2455 (9th Cir. Oct. 14, 1983); *In re McMullen,* Magistrate No. 3–78–1099 MG, slip op. at 3 (N.D.Cal. May 11, 1979).

How then is the political exception doctrine to be construed and what factors should limit its scope? Not every act committed for a political purpose or during a political disturbance may or should properly be regarded as a political offense. Surely the atrocities at Dachau, Aushwitz, and other death camps would be arguably political within the meaning of that definition. The same would be true of My Lai, the Bataan death march, Lidice, the Katyn Forest Massacre, and a whole host of violations of international law that the civilized world is, has been, and should be unwilling to accept. Indeed, the Nuremberg trials would have no legitimacy or meaning if any act done for a political purpose could be properly classified as a political offense. Moreover, it would not be consistent with the policy of this nation as reflected by its participation in those trials, for an American court to shield from extradition a person charged with such crimes.

■ The Court concludes therefore that a proper construction of the Treaty in accordance with the law and policy of this nation, requires that no act be regarded as political where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct. Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty. *Cf. McGlinchey v. Wren,* 3 Ir.L.Rep. Monthly 169 (Irish Sup.Ct.1982) (political offense exception of

Treaty between Northern Ireland and the Republic of Ireland limited by the highest court of the Republic to "what reasonable, civilised people would regard as political activity.")

■ The Court rejects the notion that the political offense exception is limited to actual armed insurrections or more traditional and overt military hostilities. The lessons of recent history demonstrate that political struggles have been commenced and effectively carried out by armed guerillas long before they were able to mount armies in the field. It is not for the courts, in defining the parameters of the political offense exception, to regard as dispositive factors such as the likelihood that a politically dissident group will succeed, or the ability of that group to effect changes in the government by means other than violence, although concededly such factors may at times be relevant in distinguishing between the common criminal and the political offender.

■ Nor is the fact that violence is used in itself dispositive.[3] Instead the Court must assess the nature of the act, the context in which it is committed, the status of the party committing the act, the nature of the organization on whose behalf it is committed, and the particularized circumstances of the place where the act takes place.

■ Considering the offenses for which extradition is sought in the light of these precepts, the Court is constrained to conclude that the political offense exception clearly encompasses those offenses. We are not faced here with a situation in which a bomb was detonated in a department store, public tavern, or a resort hotel, causing indiscriminate personal injury, death, and property damage. Such conduct would clearly be well beyond the parameters of what and should properly be regarded as encompassed by the political offense exception to the Treaty. Whatever the precise contours of that elusive concept may be, it was in its inception an outgrowth of the notion that a person should not be persecuted for political beliefs[4] and was not designed to protect a person from the consequences of acts that transcend the limits of international law.

Nor is this a case where violence was directed against civilian representatives of the government, where defining the limits of the political offense exception would be far less clear. Similarly, this is not a case where the alleged political conduct was committed in a place other than the territo-

3. In England the law may indeed be reaching the point where any violent conduct will not be regarded as political when peaceful means are available. *See* testimony of David J. Bentley, Legal Advisor to the Home Office of the United Kingdom, Tr. at 1270–74.

However, even a recent English case suggests that a political assassination committed in the country where political change is sought to be effected may be protected political conduct. *See Cheng, supra,* [1973] W.L.R. at 755–56.

4. The concept was first enunciated during an era when there was much concern for and sympathy in England for the cause of liberation for subjugated peoples. *See Schtraks, supra,* [1964] A.C. at 582–83; *see also Cheng, supra,* [1973] W.L.R. at 754–56. Nevertheless, even then there was concern that the term "political offense" should not be defined too precisely or too formalistically lest it unduly restrict proper modes of political conduct or impermissibly sanction every act committed during the cause of a political struggle. In any event, it seems fair to conclude that the Victorian and post-Victorian climate in which the doctrine arose would hard-

ly have been sympathetic to the kind of paramilitary terrorism that has become the plague of the modern age.

It is also significant that even at an early stage in the development of the political offense exception, the English courts found means to limit the concept by excluding from its definition anarchistic activity directed at all governments in general rather than at a particular regime. *See In re Meunier, supra,* 2 Q.B. at 419. Some American courts have resorted to a similar rationale, *see Eain, supra,* 641 F.2d at 521–22. *Eain* is explicit in recognizing that the best approach may be to balance the policy considerations which underline that exception against those which make it necessary to limit that exception to insure that it does not afford a haven for persons who commit the most heinous atrocities for political ends. *See Eain, supra,* 641 F.2d at 519–20; *see also In re Quinn,* Criminal No. CR–81–146–MISC, slip op. at 107–11 (N.D.Cal. Sept. 29, 1982) (Magistrate's Opinion).

ry where political change was to be effected, a circumstance that would in all probability render the political offense exception inapplicable. *See, e.g., Cheng, supra,* [1973] W.L.R. at 752–53, 755–56, 771; *Schtraks, supra,* [1964] A.C. at 591. Finally, the Court is not presented with facts which establish that hostages were killed or injured or where the principles embodied in the Geneva Convention have clearly been violated.

Instead, the facts of this case present the assertion of the political offense exception in its most classic form. The death of Captain Westmacott, while a most tragic event, occurred in the context of an attempted ambush of a British army patrol. It was the British Army's response to that action that gave rise to Captain Westmacott's death. Had this conduct occurred during the course of more traditional military hostilities there could be little doubt that it would fall within the political offense exception. The only issue remaining, therefore, is does the political exception become inapplicable because the PIRA is engaged in a more sporadic and informal mode of warfare.

■ The Court is not unmindful of the fact that it would be most unwise as a matter of policy to extend the benefit of the political offense exception to every fanatic group or individual with loosely defined political objectives who commit acts of violence in the name of those so called political objectives. Therefore it is proper for the Court to consider the nature of an organization, its structure, and its mode of internal discipline, in deciding whether the act of its members can constitute political conduct under an appropriate interpretation of the Treaty.

However, the PIRA, as the evidence showed, while it may be a radical offshoot of the traditional Irish Republican Army, has both an organization, discipline, and command structure that distinguishes it from more amorphous groups such as the Black Liberation Army or the Red Brigade. Indeed, as the testimony established, its discipline and command structure operates even after its members are imprisoned and indeed, as Doherty testified, it was at the direction of the PIRA that he escaped and then came to the United States. *See* Tr. at 650–73, 830; *see also In Re Mackin, supra,* 80 Cr.Misc. 1 at 78–80.

Given that defined structure, the fact that the PIRA may not be likely to achieve its objectives does not deprive its acts of their political character. This Court cannot, in interpreting the Treaty, make the political exception concept turn upon the Court's assessment of the likelihood of a movement's success. History is replete with examples of political and insurrectionary movements that have succeeded in effecting political changes that were believed to be improbable if not impossible.

■ The Court is not, however, persuaded by the argument that respondent's offense must or should be regarded as political merely because the United Kingdom has recognized the necessity to enact special legislation and to create special courts to deal with the problems created by the escalating violence between Republicans and Unionists in Northern Ireland. If that were the case, any lawless group could create political status for itself by merely escalating the level of this lawlessness to a point where the government is constrained to deal with it by special remedies.

The Court also specifically rejects respondent's claim that the Diplock Courts and the procedures there employed are unfair, and that respondent did not get a fair trial and cannot get a fair trial in the courts of Northern Ireland. The Court finds the testimony of the Government witnesses as to this issue both credible and persuasive. The Court concludes that both Unionists and Republicans who commit offenses of a political character can and do receive fair and impartial justice and that the courts of Northern Ireland will continue to scrupulously and courageously discharge their responsibilities in that regard. Nevertheless, the fairness of the administration of justice in those courts does not

and cannot deprive respondent's offenses of their essentially political character.[5]

Finally, the Court does not accept as dispositive the view expressed by David J. Bentley, Assistant Legal Advisor to the United Kingdom Home Office, which indicates that in England the political offense exception to extradition is now believed to encompass only those situations in which the sovereign has some interest over and above that of enforcing peace and public order in prosecuting an alleged political offender. *See* Tr. at 1232–33, 1245–53. The fact that a sovereign may be neutral in punishing violent conduct designed to achieve political ends does not in itself transform offenses that would otherwise be clearly political in nature into ordinary common law crimes.

Moreover, were the Court to accept such a view, it would be placed in the delicate situation of having to assess the neutrality and indirectly the good faith of the sovereign seeking extradition,[6] a circumstance that could adversely affect the conduct of foreign relations and might well be inconsistent with the Treaty's structure, which clearly places such determinations in the hands of the Secretary of State. *See In re Mackin,* 668 F.2d 122, 133–34 (2d Cir.1981); *Eain, supra,* 641 F.2d at 513, 516–17. *See also Sindona, supra,* 619 F.2d at 174–76. That possibility is obviously present here where it is certainly at least arguable that the United Kingdom may not be entirely neutral with respect to the issue of Irish independence because it is the end of British rule in Ireland that has been and continues to be the principal objective of the Irish Republican movement.

In sum, the Court concludes for the reasons given that respondent's participation in the military ambush which resulted in Captain Westmacott's death was an offense political in character. The Court further concludes that his escape from Crumlin Road prison, organized and planned as the evidence established that it was, under the direction of the PIRA and to effect its purposes rather than those of Doherty himself, was also political. That conduct and all of the various and sundry charges which are connected therewith and for which extradition is sought are not extraditable offenses under Article V(1)(c)(i) of the Treaty.[7] The request for extradition is therefore denied.

It is SO ORDERED.

---

**5.** It is significant of course that the discretion vested in the prosecution by the emergency legislation to try offenders in the Diplock Courts is indeed exercised on the basis of a determination that what would otherwise be common law offenses are politically motivated. *See* Northern Ireland (Emergency Provisions) Act 1978 (R.Ex. DD) at §§ 29, 31.–(1), Schedule 4 Notes 1 & 2; Northern Ireland (Emergency Provisions) Act 1973 (R.Ex. BB) at §§ 26.–(1), 28.–(1), Schedule 4 Notes 1 & 2; Diplock Report (R.Ex. AA) at ¶¶ 3–11 & Appendix; Tr. 409, 414–18, 519, 918–20.

**6.** The Court is not persuaded by the fact that the current political administration in the United States has strongly denounced terrorist acts and has stated that to refuse extradition in this case might jeopardize foreign relations. *See* Affidavit of Terrell E. Arnold ¶ 3 (June 14, 1984). The Treaty vests the determination of the limits of the political offense exception in the courts and therefore reflects a congressional judgment that that decision not be made on the basis of what may be the current view of any one political administration. *See, e.g., In re Mackin,* 668 F.2d 122, 132–37 (2d Cir.1981); *Eain, supra,* 641 F.2d at 513.

**7.** Of course it is clear that where an offense otherwise political in character is committed for purely personal reasons such as personal vengence or vindictiveness, that circumstance might well deprive the offense of its political character. In this case there is no suggestion that Doherty had any personal hostility to Captain Westmacott. There is some suggestion that the physical attack upon one of the guards may have had some retaliatory aspects, *see* R.Ex. Y at 2. However, on balance the Court is persuaded that that guard was assaulted because he sought to prevent the escape.