**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Joseph Patrick Thomas DOHERTY,
Defendant-Appellee.**

**No. 499, Docket 85–6248.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 4, 1985.
Decided March 13, 1986.

Thomas E. Moseley, Asst. U.S. Atty., for the S.D. of N.Y. (Rudolph W. Giuliani, U.S. Atty., for the S.D. of N.Y., Steven E. Obus, Asst. U.S. Atty., for the S.D. of N.Y., of counsel), for plaintiff-appellant.

Mary Boresz Pike, New York City, (Somerstein & Pike, New York City), for defendant-appellee.

Before FRIENDLY, CARDAMONE and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge: *

On this appeal we are required to deal, as we were in *Matter of Mackin,* 668 F.2d 122 (2 Cir.1981), with an attempt by the Government to escape from the long held principle that when an extradition magistrate acting under 18 U.S.C. § 3184 [1] refus-

---

* This opinion was written by the late Judge Friendly prior to his death on March 11, 1986, and concurred in by Judge Winter and Judge Cardamone before that date.

1. This provides:
 Whenever there is a treaty or convention for extradition between the United States and

any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such

es to certify a person sought to be extradited under an extradition treaty, the Government's sole recourse is to submit a request to another extradition magistrate. In *Mackin* the attempted escape route was an appeal of the denial of certification to this court; we held that an appeal did not lie. Here the attempted escape route is an action for a declaratory judgment under 28 U.S.C. § 2201, followed by an appeal to this court if the judge in the declaratory judgment action refused to take jurisdiction or ruled adversely to the Government. Although the question is closer than that decided in *Mackin*, we hold that this route also does not exist.

The request for extradition here at issue arose out of facts set forth in detail in the opinion of District Judge Sprizzo, sitting as an extradition magistrate. *See Matter of Doherty*, 599 F.Supp. 270 (S.D.N.Y.1984). The extraditee, Joseph Patrick Thomas Doherty, was a member of the Provisional Irish Republican Army ("PIRA"). On May 2, 1980, at the direction of the IRA, he and three other members of PIRA took over a private house in Belfast, holding a family hostage in the process, as part of an operation to ambush a convoy of British soldiers. A few hours later a car stopped in front of the house. Five members of the Special Air Service of the British Army emerged carrying machine guns. The two groups fired at each other; in the exchange of gunfire, Captain Westmacott of the British group was killed. Doherty was arrested and held in a Belfast prison pending trial for murder, attempted murder, illegal possession of firearms and ammunition, and belonging to the IRA, a proscribed organization. After the trial but before the decision, he escaped from prison in an operation devised by PIRA and ultimately made his way to the United States. A few days after the escape, he was convicted *in absentia* of the offenses charged.

Pursuant to Article VIII of the Treaty of Extradition between the United States of America and the United Kingdom of Great Britain and Northern Ireland, 28 U.S.T. 227, T.I.A.S. No. 8468 (effective Jan. 21, 1977) ("the Treaty"), the United Kingdom submitted a request for Doherty's extradition for the offenses of which he was convicted and other offenses allegedly committed in the course of the escape from prison. Doherty was arrested in New York City by INS officials under a provisional warrant of arrest. Later the United Kingdom filed a formal request in accordance with Article VII of the Treaty in the District Court for the Southern District of New York. The matter was referred to Judge Sprizzo, who elected to sit as the extradition magistrate. The only debatable issue was whether Doherty came within Article V(1)(c)(i) of the Treaty, which provides that extradition should not be granted if "the offense for which extradition is requested is regarded by the requested Party as one of a political character."

In *Mackin* we rejected a contention by the Government that determination whether a particular offense is within the political offense exception is solely for the executive branch, *see* 668 F.2d at 132–37, and the Government has not renewed that contention here. Judge Sprizzo engaged in a careful analysis of the political offense ex-

foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

For convenience we will generally refer to "any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State" as an "extradition magistrate."

ception. He rejected Doherty's contention that it sufficed to show that there was a political conflict in Northern Ireland and that the offense was committed during its course and in furtherance of it. 599 F.Supp. at 274. He concluded that no act should be regarded as political "where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct." *Id.* On the other hand, he also rejected the notion that the political offense exception is limited to "actual armed insurrections or more traditional and overt military hostilities." *Id.* at 275. Following the balancing approach of the Seventh Circuit in *Eain v. Wilkes*, 641 F.2d 504, 519–22, *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), he concluded that since PIRA has an organization, discipline and command structure, the case was not fairly distinguishable from one in which Captain Westmacott's death occurred during a clash between two fully organized military forces, and held that both the offenses committed in the ambush and those committed in the prison escape were political in character and did not constitute extraditable offenses under the Treaty.[2]

Spurning any effort to submit the request again to another extradition magistrate, the Government instituted this action against Doherty for a declaratory judgment in the District Court for the Southern District of New York. Subject matter jurisdiction was sufficiently alleged under 28 U.S.C. § 1331 on the ground that the action arose under the Treaty.[3] The complaint alleged the facts and proceedings substantially as stated above. It characterized Judge Sprizzo's decision as "erroneous as a matter of law" and as "arbitrary, capricious and an abuse of discretion." The prayer was for "a Judgment declaring that John Patrick Thomas Doherty is extraditable under the Treaty and directing that this matter be certified to the Secretary of State and granting such other relief as this Court may deem just and proper." The Government moved for summary judgment, submitting seven printed volumes containing the hearing record and selected exhibits in the extradition proceedings before Judge Sprizzo. Doherty cross-moved for dismissal for lack of subject-matter jurisdiction, F.R.Civ.P. 12(b)(1), and for failure to state a claim upon which relief can be granted, F.R.Civ.P. 12(b)(6). In a careful opinion, *United States v. Doherty*, 615 F.Supp. 755 (S.D.N.Y.1985), Judge Haight rejected the first ground of Doherty's motion, sustained the second, and directed that the complaint be dismissed with prejudice.[4] This appeal followed.

### DISCUSSION

The Government's position that the denial of a certificate by an extradition magis-

---

2. For discussions of the political offense exception, *see* Restatement (Revised) of the Foreign Relations Law of the United States § 477(g) & reporters' note 5 (Tent.Final Draft July 15, 1985) [hereafter *"Restatement"*]; Banoff & Pyle, *"To Surrender Political Offenders": The Political Offense Exception to Extradition in United States Law*, 16 N.Y.U.J. Int'l L. & Pol. 169, 177–92 (1984). The United States and Great Britain entered into a supplemental extradition treaty on June 25, 1985, *see* S. Treaty Doc. No. 8, 99th Cong., 1st Sess. (1985), which, the Government tells us, "would remove any ambiguity over whether the political offense exception should be construed to shelter those charged with murder or other violent crimes." The treaty was transmitted to the Senate on July 17, 1985; hearings on ratification were held before the Foreign Relations Committee on August 1, 1985, *see* 131 Cong. Rec. D913 (daily ed. July 26, 1985), and September 18, 1985, *see id.* at D1036–37 (daily ed. Sept. 18, 1985).

3. The complaint also alleged that the action arose under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, neither of which is a jurisdiction-conferring statute, *see Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), and further alleged jurisdiction on the basis of 28 U.S.C. § 1345 (actions in which United States is plaintiff) and 28 U.S.C. § 1361 (mandamus).

4. We take this to mean only that the Government could not again attack Judge Sprizzo's denial of a certificate—not that the Government was precluded from resubmitting the request to another extradition magistrate.

trate is subject to review by an action for a declaratory judgment is somewhat startling. The established law has been, or at any rate has been thought to be, that

> the extraditee in cases of grant and the requesting party in cases of denial [of an extradition request] have alternative, albeit less effective, avenues of relief. The extraditee may seek a writ of *habeas corpus,* the denial or grant of which is appealable, . . . and the requesting party may refile the extradition request. *Collins v. Loisel,* 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923); *Hooker v. Klein,* . . . [573 F.2d 1360, 1365–66 (9 Cir.1978) ]; *In re Gonzalez,* 217 F.Supp. 717 (S.D.N.Y.1963); *Ex parte Schorer,* 195 F. 334 (E.D.Wis.1912).

*Mackin,* 668 F.2d at 128. As developed in *Mackin, see id.* at 125–27, in its first encounter with this problem in 1847, a year before the predecessor of 18 U.S.C. § 3184 was enacted, the Supreme Court stated that the extradition magistrate was exercising "a special authority, and the law has made no provision for revision of his judgment." *In re Metzger,* 46 U.S. (5 How.) 176, 191–92, 12 L.Ed. 104 (1847). *Metzger* was referred to during the debates on the predecessor of § 3184, *see* Cong. Globe, July 28, 1848, and was followed under the new statute in *In re Kaine,* 55 U.S. (14 How.) 103, 119–20, 14 L.Ed. 345 (1852) (Curtis, J., concurring).[5] While *Metzger* and *Kaine* were attempts by extraditees to secure revision of orders granting certificates, the Office of the Attorney General, in response to the objection of a foreign government to a denial of extradition by a

district judge under the predecessor of § 3184, advised Secretary of State Seward in 1863 that the decision was "beyond the reach of correction either by executive or judicial power" and suggested that the foreign government submit a new request. *See* 10 Op. Att'y Gen. 501, 506 (1863). In 1908, Secretary of State Elihu Root advised a foreign ambassador that "[i]f the judicial authorities refuse to commit the fugitive for surrender on the ground that he is a political offender, or for any other reason, the matter is ended." Letter from Secretary Root to Minister Ugarte (Oct. 1, 1908), *in* 4 G. Hackworth, Digest of International Law 46 (1942).

No one has stated the longstanding principle that the Government's only remedy following denial of an extradition request is to refile the request with another extradition magistrate more clearly than the United States itself. Successive bills aimed at reforming extradition procedure have been introduced in both houses of Congress in recent years, though none has yet been enacted. *See generally* Bassiouni, *Extradition Reform Legislation in the United States: 1981–1983,* 17 Akron L.Rev. 495 (1984). One reform common to all of these bills has been a provision requiring that the Attorney General file a complaint seeking extradition with a United States district *court* (rather than, as under § 3184, with an extradition magistrate), whose order would be appealable by either the Government or the extraditee to the appropriate court of appeals and would be reviewable in that way alone.[6] *See, e.g.,* The Extradition Act of 1984, H.R. 3347, 98th Cong., 2d

---

5. As noted in *Mackin,* 668 F.2d at 127 n.9, Justice Curtis' concurring opinion, rather than Justice Catron's majority opinion, has been taken by the executive branch to be the correct statement of the law.

6. This provision has been accompanied by a corollary one denying the Attorney General the remedy of filing a new complaint based on the same facts if the district court declines to issue an order of extraditability and this is upheld on appeal. *See, e.g.,* The Extradition Act of 1984, H.R. 3347, 98th Cong., 2d Sess. § 3192(a)(2), 130 Cong. Rec. H9240 (daily ed. Sept. 10, 1984). As explained in the House report accompanying H.R. 3347:

> Because current Federal law does not authorize the Government to appeal from decisions of a district court denying the extradition of a person sought by a foreign state, the Federal courts have been generous in permitting the Government to recommence an extradition proceeding against the same person based on the same facts. Since proposed section 3195 of H.R. 3347 allows the Government to appeal from adverse determinations, the rationale for such refilings no longer exists.

H.R. Rep. No. 998, 98th Cong., 2d Sess. 11 (1984) (footnote omitted).

Sess. § 3195, 130 Cong. Rec. H9242 (daily ed. Sept. 10, 1984). As detailed in *Mackin*, 668 F.2d at 128–29, the reform efforts began in 1981 when several senators, after working for two years in close cooperation with the Department of Justice and the Department of State, introduced a bill "to modernize the extradition laws of the United States." 127 Cong. Rec. 21,169 (1981) (statement of Sen. Thurmond introducing S. 1639, 97th Cong., 1st Sess.). A legal memorandum accompanying the bill stated in unequivocal terms:

> Under present Federal law, there is no direct appeal from a judicial officer's finding in an extradition hearing. A person found extraditable may only seek collateral review of the finding, usually through an application for a writ of habeas corpus. The foreign government that is dissatisfied with the results of the hearing must institute a new request for extradition. The lack of direct appeal in extradition matters adds undesirable delay, expense, and complication to a process which should be simple and expeditious.

*Id.* at 21,174 (footnotes omitted). After hearings,[7] amendments and a subsequent reintroduction, the bill passed the Senate; but the failure of a companion bill in the House stymied reform efforts until the next session of Congress, when new bills were introduced in both houses. *See* Bas-

siouni, *supra*, at 495–96. During hearings on the House bill, H.R. 2643, held on April 28 and May 5, 1983, Roger M. Olsen, Deputy Assistant Attorney General, Criminal Division, Department of Justice, stated that one of the "important improvements in United States extradition law" made by the bill was that it

> would permit the direct appeal of court orders granting or denying extradition rather than forcing fugitives to use the more cumbersome habeas corpus review process and denying *any review* to countries requesting extradition, except through the extremely circuitous and undesirable route of filing a new extradition complaint before a different judge.

*Reform of the Extradition Laws of the United States: Hearings on H.R. 2643 Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives*, 98th Cong., 1st Sess. 35 (1984) (emphasis added). That this "extremely circuitous and undesirable route" is indeed the only remedy open to the Government was later emphasized in the report of the Subcommittee on Crime accompanying H.R. 3347, a successor bill to H.R. 2643, *see* H.R. Rep. No. 998, 98th Cong., 2d Sess. 32 (1984), and was stated explicitly on the House floor by that subcommittee's chairman when he presented the bill:

---

7. *See Mackin*, 668 F.2d at 128–29:

At a hearing held on October 14, 1981, before the Senate Judiciary Committee, Michael Abbell, Director, Office of International Affairs, Criminal Division, Department of Justice, praised the bill because, among other things

> It permits both a fugitive and the United States, on behalf of the requesting country, to directly appeal adverse decisions by an extradition court. Under present law a fugitive can only attack an adverse decision through habeas corpus, and the only option available to the United States, on behalf of a requesting country, is to refile the extradition complaint.

Daniel W. McGovern, Deputy Legal Adviser of the Department of State, said

> Under present law there is no direct appeal from a judicial officer's finding in an extradition proceeding. A person found extraditable may only seek collateral review of the finding, usually through an application for a writ of habeas corpus. The foreign government that

is dissatisfied with the results of the hearing must institute a new request for extradition. The lack of direct appeal in extradition matters adds undesirable delay, expense and complication to a process which should be simple and expeditious. Section 3195 [of the proposed bill] remedies this defect in current procedure by permitting either party in an extradition case to appeal directly to the appropriate United States court of appeals from a judge or magistrate's decision.

The bill also included a controversial provision vesting decision with respect to the political offense exception solely in the Secretary of State. *See* S.1940, 97th Cong., 2d SEss. § 3196(a)(3) (1981). This provision was deleted from subsequent bills, which retained in the judiciary—albeit with new, stricter statutory guidelines—the decision as to when an offense would fall within the political offense exception. *See* Bassiouni, *supra*, at 547–53.

Some of the changes made by H.R. 3347 are simply commonsense. Present laws do not allow either the person sought for extradition, or the government acting on behalf of the country seeking extradition, to appeal an adverse ruling. Unfortunately, both parties have had to seek review of adverse rulings in convoluted ways—the person through a writ of habeas corpus, and the Government by filing a new action before what it hopes will be a more sympathetic judge.

130 Cong.Rec. H9243 (daily ed. Sept. 10, 1984) (statement of Rep. Hughes).

The Government now tells us that everything that has been said about its remedies if the extradition magistrate refuses to issue a certificate, including what it has told the Congress within the last few years, has been wrong for the half century since the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201 *et seq.*, was adopted in 1934.[8] The language by which Justice Frankfurter in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), rebuffed the contention that claims under the general maritime law arose under the laws of the United States within the meaning of 28 U.S.C. § 1331, with an attendant right to a jury trial, might constitute a sufficient answer:

> The history of archeology is replete with the unearthing of riches buried for centuries. Our legal history does not, however, offer a single archeological discovery of new, revolutionary meaning in reading an old judiciary enactment. The presumption is powerful that such a far-reaching, dislocating construction as petitioner would now have us find in the Act of 1875 was not uncovered by judges, lawyers or scholars for seventy-five years because it is not there.

*Id.* at 370–71, 79 S.Ct. at 479 (footnote omitted). However, in view of the earnestness with which the Government presses its recent discovery upon us, we shall examine the matter further in some detail.

The Government's argument rests on the proposition that the language of the DJA is sufficiently broad to include the relief sought here, and that when Congress has wished to make exclusions, as it did for certain tax and bankruptcy matters, it has demonstrated that it knows how to say so expressly. Here we find pertinent another passage from Justice Frankfurter's *Romero* opinion:

> The statute is phrased in terms which, as a matter of inert language, lifeless words detached from the interpretive setting of history, legal lore, and due regard for the interests of our federal system, may be used as playthings with which to reconstruct the Act to include cases of admiralty and maritime jurisdiction. If the history of the interpretation of judiciary legislation teaches anything, it teaches the duty to reject treating such statutes as a wooden set of self-sufficient words....

*Id.* at 378–79, 79 S.Ct. at 483–84.

The Government does not suggest that in adopting the DJA Congress had even remotely in mind the small corner of the law governing procedures in extradition—a recondite subject with which only a handful of members could have been familiar and about which even that handful were surely not thinking at the time. It is true enough that, as the Government urges, words used by Congress have been properly held to cover situations that its members had not considered. But it does not follow that because the words of a statute have sufficient generality to include a particular subject, courts must jump to the conclusion that Congress meant to cover it. What we must decide is whether Congress, had it reflected in 1934 on the problem here presented, would have wished the DJA to upset the remedial balance with respect to acts of extradition magistrates that had been achieved over more than seventy-five years and was to continue for fifty more.

---

**8.** It is not clear whether the Government takes the position that the DJA has become its exclusive remedy or a supplement that may be invoked after the denial of a renewed request or requests. We see nothing in the logic of the Government's statutory analysis, were we to adopt it, that would prevent the Government from following the latter course in future cases.

We find no sufficient reason to think that it would have and, as we shall see, many reasons to think that it would not. The existing law on extradition procedure had been quite recently restated by the Supreme Court in *Collins v. Loisel,* 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923), and we have been pointed to no contemporaneous congressional expression of dissatisfaction with it. Of course, we cannot know, but it seems much more likely to us that if Congress had thought about the matter in 1934 it would have decided to leave extradition procedures as they were and would have wished, if events should later prove a change to be desirable, to have this take the form of a comprehensive revision of the kind we have seen introduced in Congress in the past five years. In a brief filed only a week before the present case was argued, the Government urged in support of an extradition request before a magistrate in the Eastern District of Virginia that "[i]nternational extradition proceedings conducted pursuant to Title 18, United States Code, Section 3181, *et seq.* and the applicable Treaty ... are *sui generis,* and are controlled by a self-contained body of law. The uniqueness of the body of law dealing with international extradition cannot be overemphasized." Government's Brief at 2, *In re Gordon,* Magistrate's Docket No. 85–46–S (E.D.Va. Nov. 27, 1985).[9] So it was when the DJA was adopted and so, we think, Congress would have desired it to remain thereafter unless and until Congress spoke directly to the point.

The use to which the Government would put the DJA does not fit comfortably within its purpose or within the language of § 3184. The purpose of the DJA has been expressed a variety of ways: "Essentially, a declaratory relief action brings an issue before the court that otherwise might need to await a coercive action brought by the declaratory relief defendant," *Mobil Oil Corp. v. City of Long Beach,* 772 F.2d 534, 539 (9 Cir.1985); the fundamental purpose of the DJA is to " 'avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued'," *Luckenbach Steamship Co. v. United States,* 312 F.2d 545, 548 (2 Cir. 1963) (quoting *E. Edelmann & Co. v. Triple-A Specialty Co.,* 88 F.2d 852, 854 (7 Cir.), *cert. denied,* 300 U.S. 680, 57 S.Ct. 673, 81 L.Ed. 884 (1937); the primary purpose of the DJA is to have a declaration of rights not already determined, not to determine whether rights already adjudicated were adjudicated properly, *Hurley v. Lindsay,* 207 F.2d 410, 411 (4 Cir.1953); the declaratory judgment procedure "creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it," Wright, *The Law of Federal Courts* § 100, at 671 (4th ed. 1983); the declaratory judgment procedure "enable[s] a party who is challenged, threatened or endangered in the enjoyment of what he claims to be his

9. The proposition that extradition proceedings are *sui generis* finds ample support in the case law. *See, e.g., Eain v. Wilkes,* 641 F.2d 504, 508–09 (7 Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Hooker v. Klein,* 573 F.2d 1360, 1367–68 (9 Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2 Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); *First Nat'l City Bank v. Aristeguieta,* 287 F.2d 219, 223 (2 Cir.1960), *vacated as moot,* 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963); *In re Vandervelpen,* 14 Blatch. 137, 139 (S.D.N.Y.1877). To take only two examples, the Federal Rules of Evidence and of Criminal Procedure do not apply in extradition hearings,

F.R.E. 1101(d)(3); F.R.Cr.P. 54(b)(5), and the extraditee's grounds for opposing the request for extradition are severely limited, *see, e.g., Collins v. Loisel,* 259 U.S. 309, 315–17, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922); *Hooker,* 573 F.2d at 1368. The Government contends that simply because extradition proceedings are *sui generis* is not a sufficient reason to hold Judge Sprizzo's decision unreviewable under the DJA. This is to miss the point. That extradition law is and always has been considered *sui generis* merely suggests that Congress would not have wished a broad, all-purpose remedial statute like the DJA to work the radical changes in extradition procedures that the Government here proposes.

rights, to initiate the proceedings against his tormentor and remove the cloud by an authoritative determination of the plaintiff's legal right, privilege and immunity and the defendant's absence of right, and disability," Borchard, *Declaratory Judgments* 280 (2d ed. 1941). *See generally id.* at 277–92 (listing purposes of declaratory judgments).

 None of these formulations fits what the Government is seeking here. To be sure, the Government has sought to veil the true nature of the present action by characterizing it as an attempt to secure a

"review" of Judge Sprizzo's decision and asking that the declaratory judgment court, if it reads the political offense exception more narrowly than Judge Sprizzo did, should *itself* issue the certificate that § 3184 makes a necessary precondition to extradition. However, since the plain language of § 3184 forbids the latter,[10] the utmost that the declaratory judgment court could do would be to define the political offense exception in a manner that would have preclusive effect when the Government went before another extradition magistrate.[11] It is that later proceeding, not

---

**10.** We thus need not consider whether, consistently with *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), Congress could constitutionally vest an Article III *court* with the nonjudicial function of issuing the certificate—nonjudicial because, as pointed out in *Mackin,* 668 F.2d at 136 n. 9, the Secretary of State is not bound to extradite even if the certificate is granted. *See* Note, *Executive Discretion in Extradition,* 62 Colum.L.Rev. 1313 (1962).

**11.** The cases cited by the Government in which a reviewing court overturned administrative action and ordered affirmative relief are not to the contrary, since in each case the court was acting pursuant to one or more statutes granting it broad power to review the action in question and take whatever remedial steps it found necessary. In *DeLeon v. Secretary of HHS,* 734 F.2d 930 (2 Cir.1984) (reviewing court restores social security disability payments), the statute was 42 U.S.C. § 405(g), which authorizes judicial review of any final decision of the Secretary, and § 405(i), which provides that a certificate of payment shall issue, *inter alia,* "upon final judgment of any court of competent jurisdiction, that any person is entitled to payment." In *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2 Cir.1972) (reviewing court allows aliens to apply for visas as though their priority dates were reached), and *Unification Church v. INS,* 547 F.Supp. 623 (D.D.C.1982) (reviewing court overturns decisions denying aliens' applications for permanent resident alien status), the statutes were § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, which authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions," and 8 U.S.C. § 1105a(a), which authorizes judicial review of all final orders of deportation and exclusion. In *Parco v. Morris,* 426 F.Supp. 976 (E.D.Pa.1977) (reviewing court in *habeas* action authorizes aliens to remain in the United States as if under an administrative order extending voluntary departure), the statute was 28 U.S.C. § 2243, which

provides that a *habeas* court shall "dispose of the matter as law and justice require"; moreover, in that case the court acted on the basis of a stipulation by the INS district director that departure extensions should be granted if petitioners prevailed in their action.

The Government does not contend that the present action would fall within the terms of any of the above statutes. Rather, it argues that the DJA itself would clothe a declaratory judgment court with the broad power to issue an extradition certificate in this case and directs our attention to 28 U.S.C. § 2202, which provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." It is well established, however, that the DJA is procedural in nature and neither augments nor diminishes the jurisdiction of the federal courts, 6A Moore's Federal Practice ¶ 57.23 (1985); consequently, a declaratory judgment court cannot grant "further relief" under 28 U.S.C. § 2202 unless it has jurisdiction to do so. The Government has not directed our attention to any jurisdictional basis for the issuance of an extradition certificate apart from 18 U.S.C. § 3184—and that statute, by its terms, confers jurisdiction only upon extradition magistrates. Among the cases it cites, only *Louis v. Nelson,* 544 F.Supp. 1004 (S.D.Fla. 1982), involved relief based even in part on 28 U.S.C. § 2202. There, a class consisting of Haitian aliens being held in detention pending exclusion proceedings brought an action seeking a writ of *habeas corpus* and declaratory and injunctive relief. The district court ruled in petitioners' favor, 544 F.Supp. 973 (S.D.Fla.1982), *dismissed in part, rev'd in part sub nom. Jean v. Nelson,* 727 F.2d 957 (11 Cir.1984) (en banc), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); then, invoking its power "pursuant to 28 U.S.C. §§ 2202 and 2241," the court ordered that all incarcerated class members be released on parole and that each be given an employment authorization. 544 F.Supp. at 1006–07. The granting of

Judge Sprizzo's ruling, at which the present action is truly aimed.[12]

None of the formulations cited above suggests that the DJA was intended to enable the Government, here acting as the prosecution in proceedings that the Supreme Court and we have referred to as being of a criminal nature, *see Grin v. Shine*, 187 U.S. 181, 187, 23 S.Ct. 98, 101, 47 L.Ed. 130 (1902); *Rice v. Ames*, 180 U.S. 371, 374, 21 S.Ct. 406, 407, 45 L.Ed. 577 (1901); *First National City Bank v. Aristeguieta*, 287 F.2d 219, 226 n.7 (1960), *vacated as moot*, 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963), to arm itself with a favorable ruling on the law before starting a new proceeding. The Government has no need of declaratory relief to head off a threatened suit by Doherty that would impose a detriment on it; on the contrary, it is the Government that wants to impose the detriment on Doherty. It seeks to use declaratory judgment as a sword rather than a shield. Having tried and failed to obtain a certificate from Judge Sprizzo, it fears that it may lose when it tries again before another extradition magistrate and seeks insurance in the form of a declaration of law by a district court and ultimately by this court or even the Supreme Court. As Justice Jackson remarked, "the declaratory judgment procedure will not be used to pre-empt and prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review." *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 246, 73 S.Ct. 236, 241, 97 L.Ed. 291 (1952). The Government has not cited, and we have not been able to find, a single case in which a declaratory judgment was used in a manner resembling that which the Government proposes here.

Against all these considerations, the Government relies on *Wacker v. Bisson*, 348 F.2d 602 (5 Cir.1965), in which a divided court of appeals held that an extraditee could secure review of the grant of a certificate by an action for a declaratory judgment. The Government argues that what is sauce for the goose is sauce for the gander. It also relies on cases in which the courts have sustained use of the DJA for attacks on administrative action.

Wacker, awaiting extradition to Canada for violations of its securities laws, had already brought two unsuccessful petitions for *habeas corpus*, from the results of which he had not appealed. He then brought what Judge Wisdom called an "off-beat declaratory judgment action attacking the validity of an unappealable extradition order." 348 F.2d at 604. Judge Wisdom added that "[s]ince Wacker is in custody," as extraditees inevitably are since § 3184 proceedings begin with an arrest,[13] "he might just as well have cast the action in the form of an application for habeas corpus." *Id.* But evidently tired of

---

work authorizations collateral to the release in *habeas* of aliens unlawfully detained hardly stands as a precedent for the relief the Government seeks here. Not only are deportation and exclusion decisions subject by statute to judicial review, *see* 8 U.S.C. § 1105a, but jurisdiction over the granting of work authorizations to aliens temporarily paroled into the United States—unlike jurisdiction over the issuance of extradition certificates—is not denied the reviewing court by statute. *See* 8 C.F.R. § 109.-1(b). Thus, the district court in *Louis* had jurisdiction under 28 U.S.C. § 2202 to fashion the remedy sought; a declaratory judgment court in the present action would not.

**12.** This analysis reveals still another objection to the Government's invocation of the DJA, namely, that the decision of the declaratory judgment court will not "finally settle and determine the controversy." *See Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 243 & n. 4, 73 S.Ct. 236, 240 & n. 4, 97 L.Ed. 291 (1952) (citing S.Rep. No. 1005, 73d Cong. 6 (1934), and Borchard, *supra*, at 1043, 1048); 6A Moore's Federal Practice ¶ 57.08[4] (1985).

**13.** Although the extradition laws make no provision for bail, it has been granted in numerous cases, particularly at the stage between arrest and completion of the hearing before the magistrate. *See Restatement, supra* note 2, § 479 at reporters' note 3. Release on bail following arrest does not remove an extraditee from custody for *habeas corpus* purposes. *See Hensley v. Municipal Court*, 411 U.S. 345, 349, 93 S.Ct. 1571, 1573, 36 L.Ed.2d 294 (1973); *Jhirad v. Ferrandina*, 355 F.Supp. 1155, 1158 (S.D.N.Y.), *rev'd on other grounds*, 486 F.2d 442 (2 Cir. 1973).

*habeas,* Wacker sued the Consul General of Canada in New Orleans under the DJA, advancing "all possible, and some impossible, reasons for the invalidity of the extradition." *Id.* If Wacker thought that by doing this he would achieve a broader scope of review than in *habeas,* he failed; the majority held that "the scope of review of an extradition hearing should be the same whether the extraditee chooses habeas corpus or declaratory judgment." *Id.* (footnote omitted). Nevertheless, the majority held that the action for a declaratory judgment would lie. Judge Rives dissented, making the commonsensical observation:

> The majority holds that the scope of review in a declaratory judgment action is the same as in a habeas corpus proceeding. The point of holding that the Declaratory Judgment Act has opened a backdoor to review of an extradition order escapes me when the front door provided by the Great Writ grants access to the same court of justice and provides the same scope of relief.

*Id.*

As Judge Haight noted below, "Ultimately Wacker's procedural victory availed him nothing." 615 F.Supp. at 759 n. 4. The *Wacker* majority also recognized this, remarking that "[u]nfortunately for Wacker, he is no better off in a declaratory judgment action than in his habeas corpus proceedings.... Indeed, he may be worse off." 348 F.2d at 610. The court directed that

> [i]f the district court should conclude that Wacker has had a full and fair hearing in the two habeas proceedings on those issues in this case which are serious, there is no necessity for holding any additional evidentiary hearing.

*Id.* at 611. On remand, the district court tendered Wacker an additional evidentiary hearing, but the parties agreed that the case should be decided on the prior record.

The court thereupon dismissed the declaratory judgment action, *Wacker v. Beeson,* 256 F.Supp. 542 (E.D.La.1966), and the Fifth Circuit affirmed *per curiam,* 370 F.2d 552 (5 Cir.), *cert. denied,* 387 U.S. 936, 87 S.Ct. 2063, 18 L.Ed.2d 999 (1967).

So far as we can ascertain, in no case except *Wacker* has an extraditee sought to challenge the issuance of a certificate by an action for a declaratory judgment.[14] Since *Wacker* held that the scope of review in such an action is no broader than in *habeas,* which is always available, extraditees have evidently not thought the declaratory judgment game to be worth the candle.

Although *Wacker* is thus not the most substantial of foundations, upon it the Government builds an elaborate argument that it is entitled to "parity" with the extraditee in access to the declaratory judgment remedy. This argument cannot stand, even if we assume *arguendo* that *Wacker* was correctly decided—a question on which we express no opinion. The extraditee has always been able to obtain limited collateral "review" when a certificate has issued; it is of little moment whether the procedure is called *habeas corpus* or declaratory judgment so long as the scope of review is identical, as *Wacker* has held it to be. On the other hand, the Government has never been thought to be able to obtain "review" when the certificate has been denied. Its sole recourse, as discussed *supra,* has been to file another request—a request that must be considered *de novo* by the new extradition magistrate, who will give the opinion of the previous magistrate only such weight as he would give to an opinion of a respected judge in an unrelated case. *See Mackin,* 668 F.2d at 137 n. 20. If this request too should fail, the Government may try again, subject always to reservations expressed in *Collins v. Loisel,* 262 U.S. at 429–30, 43 S.Ct. at 619. If a subsequent try should result in the issuance of a certificate, the extraditee

---

14. In *Sayne v. Shipley,* 418 F.2d 679 (5 Cir. 1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970), where the challenge to extradition was by *habeas corpus,* the court mentioned in a footnote, citing *Wacker,* that review could also have been had by declaratory judgment. *Id.* at 685 n. 17.

may secure review in *habeas*. Since there was no "parity" between the Government and the extraditee before *Wacker*, and *Wacker* did not benefit the extraditee except semantically, there is no reason why it should work the important change in the rights of the Government that is asserted here.

Beyond this, the Government's "parity" argument blinks an essential distinction between the grant and the denial of a certificate. A grant puts the extraditee well on the way to extradition; *habeas* or declaratory judgment is his last judicial chance. Denial of a certificate simply sends the Government back to square one. We find it somewhat puzzling that the Government should regard this as so unsatisfactory; in the past, complaint has come rather from the extraditee at being forced to undergo a second hearing. *See id.* at 429, 43 S.Ct. at 619; *Hooker v. Klein*, 573 F.2d 1360, 1366–68 (9 Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). If an analogy must be found, the closest, though admittedly not a perfect one, lies in the power of a magistrate, after a preliminary hearing, to discharge a person against whom a criminal complaint has been filed and to dismiss the complaint, after which the prosecutor's remedy is to institute a new proceeding. *See* F.R. Cr.P. 5.1(b) & advisory comm. notes (citing *Collins v. Loisel*). We have found no case remotely suggesting that such a decision is subject to collateral attack by declaratory judgment.

The Government fares no better with its argument that since the DJA is commonly employed to challenge actions of administrative agencies, it should also be available to "review" a decision of an extradition magistrate denying a certificate under 18 U.S.C. § 3184. The Government relies principally on *Brownell v. Tom We Shung*, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956), and *Shaughnessy v. Pedreiro*, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955), which held that deportation and exclusion orders could be reviewed in suits for a declaratory judgment and not simply by *habeas corpus*. It neglects to mention,

however, that both decisions—like the great majority of modern cases involving judicial review of administrative action—rested on § 10(a) and (b) of the Administrative Procedure Act ("APA"), now 5 U.S.C. §§ 702 and 703, which provide in pertinent part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

\* \* \* \* \* \*

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.

We have already indicated certain reasons why the APA could not apply here. One is that the variety of officers mentioned in 18 U.S.C. § 3184—a Supreme Court justice, United States circuit and district judges, a duly authorized United States magistrate, or a judge of a state court of general jurisdiction—cannot individually or as a group reasonably be deemed to constitute an "agency" within 5 U.S.C. § 551(1). *See Wacker*, 348 F.2d at 608 n.18. Another is that since there is no provision that would authorize a declaratory judgment court to issue a certificate or to direct the extradition judge to do so, *see supra* note 11; *cf.* 5 U.S.C. § 706 (empowering reviewing court to compel agency action unlawfully withheld), what the Government here seeks in reality is not a "review" of Judge Sprizzo's decision but a declaration that will bind another extradition judge in a proceeding not yet commenced. The present action also fails to meet the tests of the first sentence of 5 U.S.C. § 704:

> Agency action made reviewable by statute and final agency action for which

there is no other adequate remedy in a court are subject to judicial review.

Judge Sprizzo's denial of a certificate was not "final" since the Government may try again, and this opportunity could well constitute an "adequate remedy in a court" if, as suggested in *Wacker*, 348 F.2d at 608 n.18, the officers enumerated in 18 U.S.C. § 3184 might be a "court" for purposes of 5 U.S.C. § 704 though not for purposes of appeal under 28 U.S.C. § 1291, *see Mackin*, 668 F.2d at 129–30.

■ More fundamentally, *Brownell*, *Shaughnessy* and other cases cited by the Government are cases in which private persons were allowed to challenge administrative action by a suit for a declaratory judgment, not ones where the Government in its sovereign capacity was permitted, in the absence of a specific statutory review procedure, to bring a declaratory judgment action to overturn the refusal of an authority created by the United States to grant the relief the Government had sought— particularly not when the time-honored course had been, as here, for the Government to try again before the authority, which would in no way be bound by the previous decision. The seminal case on non-statutory judicial review of administrative action, *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), does not support the Government's position. The Supreme Court's decision upholding judicial review in that case was posited on the proposition that when

> definite personal rights are created by federal statute, similar in kind to those customarily treated in courts of law, the silence of Congress as to judicial review is, at any rate in the absence of an administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction.

*Id.* at 309, 64 S.Ct. at 571 (footnote omitted). Nor can the Government derive comfort from either *Public Utilities Commission v. United States*, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), or *United*

*States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). The former held that the United States could avail itself of the DJA to challenge action by a state commission allegedly interfering with an exercise of federal power. While this illustrates that the Government is not precluded from seeking declaratory relief in appropriate cases, the opinion contains nothing to suggest that an action like the present one is such a case. The latter had nothing to do with declaratory judgment; it held that the United States, in its capacity as a shipper, was not precluded from resort to a general statutory provision for review of Interstate Commerce Commission orders simply because the statute required that the United States, as sovereign, be named as a defendant. *See also Federal Maritime Board v. Isbrandtsen Co.*, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958) (Department of Justice and Secretary of Agriculture, as commercial shipper, joined private shipper in obtaining statutory judicial review of Maritime Board rates); *Secretary of Agriculture v. United States*, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954) (pursuant to special statutory authority, Secretary of Agriculture intervened on behalf of agricultural interests and obtained statutory judicial review of ICC rates). These three cases merely confirm that when the United States or one of its agencies is placed in the position of a private person burdened by administrative action, it may take advantage of statutory procedures for judicial review like any other private litigant. In requesting Doherty's extradition, however, the Government is clearly acting in its sovereign capacity, and the analogy it would have us draw from these cases breaks down accordingly.

Since introduction of a declaratory judgment remedy for the Government when an extradition magistrate denies a certificate runs counter not only to fifty years of history but to the evident purpose of 18 U.S.C. § 3184 and of the Declaratory Judgment Act itself, the order dismissing the complaint for failure to state a claim upon which relief can be granted is affirmed.