# Deportation Proceedings for
# Joseph Patrick Thomas Doherty

The Attorney General disapproved the decision of the Board of Immigration Appeals to permit the respondent to reopen his deportation proceedings in order to apply for relief from deportation and to redesignate his country of deportation.

June 30, 1989

IN DEPORTATION PROCEEDINGS

This matter has been certified to me by the Commissioner of the Immigration and Naturalization Service ("INS") from the decision of the Board of Immigration Appeals ("BIA"). 8 C.F.R. § 3.1(h)(1)(iii). On November 14, 1988, the BIA granted the respondent's motion to reopen these proceedings in order to allow him to apply for asylum and for withholding of deportation and to permit him to redesignate his country of deportation. *Matter of Doherty*, No. A26 185 231 (BIA Nov. 14, 1988). For the reasons set forth below, I disapprove the BIA's decision, and deny respondent's motion to reopen his deportation proceedings.

## I.

1. Respondent is a 34-year-old native of Northern Ireland and a citizen of both the United Kingdom ("U.K.") and the Republic of Ireland. He has been an active volunteer in the Provisional Irish Republic Army ("PIRA") since 1972. The BIA summarized his criminal record as follows:

> He has an extensive criminal record in Ireland beginning
> with convictions as a juvenile for burglary and larceny. He
> was sentenced to probation, fines, and 1 month in a train-
> ing school. At approximately age 15, the respondent joined
> Na Fianna Eireann, a youth organization in Ireland that is
> considered to be a stepping stone into the PIRA. When he
> turned 17, in 1972, he joined the PIRA as a volunteer. In
> 1973, he was arrested, and later convicted, for possession
> of a firearm. He was sentenced to 1 year in prison and he
> served 9 months. In 1974, he was arrested for possession of
> 80 pounds of explosives. He was convicted and sentenced

1

to 10 years imprisonment. He served 5 years and 9 months of that sentence. During that term of imprisonment, the respondent attempted to escape, but he was unsuccessful. He was convicted of prison breaking with intent to escape and received a sentence of an additional 18 months [of] imprisonment. After his release from prison in December of 1979, he returned to the PIRA. On May 2, 1980, while on a mission for the PIRA, he was involved in a gun battle in which a British army Captain was killed. He was tried and found guilty of murder, attempted murder, possession of firearms and ammunition, and belonging to a proscribed organization.

*In re Doherty*, No. A26 185 231, slip op. at 1-2 (BIA Mar. 4, 1985).

Throughout the course of these proceedings, respondent has never disputed the underlying facts relating to the last set of crimes. On May 2, 1980, he and several other PIRA members seized and occupied a private home, from which they planned to ambush British troops. In the ensuing gunfight with the troops, Captain Herbert Richard Westmacott, a British Army captain, was shot and killed. Respondent was arrested and charged with murder, attempted murder, illegal possession of firearms, and other offenses. On June 10, 1981, after trial, but before a decision was reached, respondent escaped from prison. On June 12, 1981, he was convicted, in absentia, of murder and the other offenses with which he had been charged, and was sentenced to life imprisonment.

After his escape, respondent made his way to the United States, where he was arrested on June 18, 1983. A formal request for extradition was filed in the Southern District of New York on August 16, 1983. At about the same time, a deportation warrant was also filed against him. On June 28, 1983, respondent filed for asylum and withholding of deportation.

2. The extradition proceeding was brought pursuant to 18 U.S.C. § 3184 and Article VII of the then-existing Treaty of Extradition between the United States and the United Kingdom, Extradition Treaty, Oct. 21, 1976, U.S.-U.K., 28 U.S.T. 227, (effective Jan. 21, 1977) ("Extradition Treaty"), under which "political offenses" were an exception to extradition. A hearing was held in the United States District Court for the Southern District of New York in March and April of 1984. In December 1984, the court ruled that respondent could not be extradited because the murder he had committed was "of a political character" within the meaning of the Extradition Treaty. The court thus denied the request for extradition. *Matter of Doherty by Gov't of U.K.*, 599 F. Supp. 270 (S.D.N.Y. 1984).

Although the court determined that respondent was not extraditable, it rejected the contention that the proceedings against him in Northern Ireland had failed to provide due process. The court concluded:

2

> [B]oth Unionists and Republicans who commit offenses of
> a political character can and do receive fair and impartial
> justice and...the courts of Northern Ireland will continue to
> scrupulously and courageously discharge their responsibil-
> ities in that regard.

*Matter of Doherty by Gov't of U.K.*, 599 F. Supp. at 276.[1]

3. Immediately upon the conclusion of the extradition proceeding, the deportation proceeding went forward. It was delayed, however, for almost 18 months, from March 18, 1985, until September 3, 1986, as a result of a stay which was entered on respondent's motion, and which the INS opposed. *See Doherty v. Meese*, 808 F.2d 938, 941 (2d Cir. 1986).

On September 12, 1986, at a hearing before an immigration judge, respondent, through his counsel, withdrew the applications for asylum and for withholding of deportation that he had filed in June 1983, and conceded deportability.[2] Asked by the immigration judge whether he was saying that he "no longer wish[ed] to apply for asylum and [was] ... waiving his right to asylum", respondent's counsel replied, "[t]hat is correct, Your Honor." Respondent's counsel continued: "We would, at this time, withdraw the application for political asylum. The only thing that we would request would, of course, be the opportunity to desingnate [sic] a country." *See* Transcript of Sept. 12 Hearing, *supra* note 2, at 38. The colloquy between the immigration judge and respondent's counsel continued as follows:

> Q. ...I just want to be sure there won't be any application for
> political asylum and/or withholding of deportation, correct?
>
> A. That is correct.
>
> Q. No application for voluntary departure?
>
> A. That is correct.
>
> Q. In other words, there is no application for relief from
> deportation that you will be making?

---

[1] The United States challenged the denial of extradition by bringing an action under the Declaratory Judgment Act, 28 U S.C. § 2201, in the Southern District of New York  The district court and the United States Court of Appeals for the Second Circuit both held, however, that bringing the extradition request before another judge was the only proper means of challenging the decision denying extradition. *United States v Doherty*, 615 F. Supp 755 (S.D N Y 1985), *aff'd*, 786 F.2d 491 (2d Cir. 1986).

[2] *See* Transcript of Hearing at 36, 38-40, *Matter of Doherty*, No  A26 185 231 (BIA Sept  12, 1986) ("Transcript of Sept. 12 Hearing"); *see also* Petition of Joseph Patrick Thomas Doherty for an Order to Show Cause for a Writ of Habeas Corpus at para. 43, *Doherty v. Meese*, 808 F.2d 938 (2d Cir. 1986) ("Doherty Petition"), Affidavit of Mary Boresz Pike (Counsel for Respondent), sworn to Dec  2, 1987, at paras. 10-14 ("Pike Affidavit").

3

A. That is correct.

*Id.* at 38-39. Respondent designated the Republic of Ireland as his country of deportation, pursuant to 8 U.S.C. § 1253(a). The INS strongly opposed this designation on the ground that it would be prejudicial to the interests of the United States to send respondent to Ireland. The INS explained to the court that the deportation of respondent to the United Kingdom was a matter of great interest at the highest levels of the federal government. Transcript of Sept. 12 Hearing, *supra* note 2, at 41-43, 47-48; Transcript of Hearing at 57, *Matter of Doherty*, No. A26 185 231 (BIA Sept. 19, 1986). The court denied the INS' request for permission to submit evidence of additional grounds for deportation, because respondent had conceded deportability and waived his claims to asylum and withholding of deportation. *See* Transcript of Sept. 12 Hearing, *supra* note 2, at 39-40.

One week later, on September 19, 1986, the immigration judge found respondent deportable on his own admission for having entered this country in February 1982 by fraud and without a valid immigrant visa. *See* 8 U.S.C. §§ 1182(a)(19)-(20), 1251(a)(1).[3] Over the INS' strenuous objection, the immigration judge ordered respondent deported to the country of his designation, the Republic of Ireland.

At the time of the immigration judge's decision, respondent faced a ten-year sentence of imprisonment in Ireland under a "dual prosecution agreement" between Ireland and the United Kingdom. *Doherty v. Meese*, 808 F.2d at 940.[4] Respondent's consent to deportation and his withdrawal of his applications for relief from deportation were apparently prompted by the imminent ratification and implementation of the Supplementary Extradition Treaty with the United Kingdom, S. Exec. Rep. No. 99-17 (1985) (effective Dec. 23, 1986) between the United States and the United Kingdom ("Supplementary Treaty").[5] Under the Supplementary Treaty, respondent could have been extradited directly to the United Kingdom, where, as noted, he faced a life sentence for murder. "[Respondent] thus urgently want[ed] to leave the United States for Ireland, where he face[d] only a ten-year sentence, before the British

---

[3] *Matter of Doherty*, No A26 185 231 (BIA Sept 19, 1986)

[4] It was also likely that respondent would be tried in the Republic of Ireland for his escape from prison in Belfast, Northern Ireland. *See* Doherty Petition, *supra* note 2, at para 55.

[5] The Supplementary Treaty amended the Extradition Treaty. The Supplementary Treaty had been ratified by the United States Senate on July 17, 1986, and, at the time of the immigration judge's September 19, 1986 decision, was pending before the British House of Commons. Respondent apparently expected the House of Commons to ratify the treaty sometime in October 1986. *See* Doherty Petition, *supra* note 2, at para. 33. The Supplementary Treaty became operative on December 23, 1986

Under Article 4 of the Supplementary Treaty, the "political offense" exception to extradition in the Extradition Treaty was eliminated with retroactive effect. Thus, ratification and implementation of the Supplementary Treaty might have rendered respondent subject to extradition, despite the prior district court decision denying such a request

House of Commons act[ed] upon the treaty." *Doherty v. Meese*, 808 F.2d at 940.

4. The INS appealed the immigration judge's decision to the BIA. Respondent, however, in an attempt to prevent the INS from continuing to contest respondent's deportation to Ireland, petitioned the district court for a writ of habeas corpus, which was denied on September 25, 1986. *Id.* at 941. Respondent appealed to the Second Circuit.

On December 23, 1986, the Second Circuit affirmed the district court's denial of respondent's habeas corpus petition. In so doing, the court rejected respondent's contention that the government was resisting respondent's departure to Ireland solely for the purpose of assuring his continued availability for extradition to the United Kingdom upon final ratification of the Supplementary Treaty. The court stated that it had jurisdiction to intervene in the pending deportation proceeding "only if the Attorney General is clearly outside the discretion granted to him by Section 1253(a) in rejecting the Republic of Ireland and designating the United Kingdom and is clearly unreasonable in pressing his position through the administrative process." *Id.* at 942.

The court determined that the INS' appeal of the immigration judge's order to the BIA was not unjustified because it was reasonable for the Attorney General to conclude and to argue that the interests of the United States would be prejudiced by deporting respondent to Ireland. *Id.* at 943. The court stated that the judgment as to whether the interests of the United States would be prejudiced was "an essentially political determination." *Id.* The court also noted that "[t]he lack of precedent hardly renders the government's position frivolous." *Id.* at 941 n.3. Further, the court pointed out that, in a case such as this, apart from claims such as fraud, lack of jurisdiction, or unconstitutionality, "the determination of the Attorney General is essentially unreviewable." *Id.* at 944 (footnote omitted).

5. Thereafter, on March 11, 1987, the BIA dismissed the INS' appeal of the immigration judge's September 19, 1986 order, and denied an INS motion to supplement the record. The Commissioner of the INS sought review by Attorney General Meese pursuant to 8 C.F.R. § 3.1(h)(1)(iii). The Attorney General granted the INS' request for review and allowed respondent and the INS to submit additional evidence and memoranda.

On December 3, 1987, while the issue of respondent's deportation to Ireland was pending before Attorney General Meese, respondent moved to reopen his deportation proceedings pursuant to 8 C.F.R. §§ 3.2, 3.8, and 242.22, to apply for asylum and withholding of deportation, and to change his designated country of deportation. Motion of Respondent to Reopen or to Reconsider at 1, *Matter of Doherty*, No. A26 185 231 (BIA Dec. 3, 1987). Respondent claimed that his motion was prompted by a change in Irish law. In the opinion of respondent's counsel, the Extradition (European Convention on the Suppression of Terrorism) Act ("Extra-

dition Act"), which went into effect in Ireland on December 1, 1987, would allow respondent's extradition from Ireland to the United Kingdom.[6]

6. On June 9, 1988, Attorney General Meese disapproved the BIA's decision, ruled that the INS had shown that respondent's deportation to Ireland would be prejudicial to the interests of the United States, and ordered respondent deported to the United Kingdom. *Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1 (1988) ("Deportation Proceedings"). The Attorney General rested his decision on two separate considerations: first, that respondent's deportation to the United Kingdom would serve the policy of the United States that those who commit violent acts against a democratic state should be promptly and lawfully punished and second, that the Department of State had shown that respondent's deportation to Ireland rather than to the United Kingdom would be detrimental to the United States' foreign policy interests.[7] Respondent's motion to reopen also was considered in the Attorney General's June 9, 1988 ruling; the motion was remanded to the BIA. *Id.*

7. On November 14, 1988, five months after Attorney General Meese's order, the BIA granted respondent's motion to reopen by a 3-2 vote. *Matter of Doherty*, No. A26 185 231 (BIA Nov. 14, 1988). The BIA majority acknowledged that there is "no absolute right to withdraw a prior designation of a country of deportation." *Id.* slip op. at 5. However, the BIA found that at the time of his hearing before the immigration judge, respondent had "the reasonable expectation ... that he would be deported to Eire" and that "[t]he likelihood of his being deported to the United Kingdom appeared remote." *Id.* at 6. "Given the state of the law at that time, the respondent could not have been expected to anticipate that he would not be deported to his country of choice. The respondent's failure to file for asylum under these circumstances is excusable." *Id.*

The BIA also held that "the Attorney General's decision of June 1988 disallowing the respondent's choice of a country of deportation constitutes changed circumstances which have arisen since the hearing." *Id.* Additionally, respondent had "submitted recently published background evidence which we find to be material to the respondent's case." *Id.* The BIA majority provided no analysis of this evidence to support its conclusion.

Finally, the BIA majority held that respondent's evidence established a prima facie claim of a well-founded fear of persecution. It noted that the INS would have the opportunity to prove that respondent had engaged in conduct which rendered him either ineligible for withholding of deporta-

---

[6] *See* Pike Affidavit, *supra* note 2, at paras. 25-28; *see also* European Convention on the Suppression of Terrorism, 1977, Europ T.S. No. 90

[7] Respondent has appealed the Attorney General's June 9, 1988 ruling to the Second Circuit. *Doherty v. United States Dep't of Justice*, No 88-4084 (2d Cir filed June 21, 1988) The parties have agreed to suspend any action on that appeal pending the outcome of this appeal by the INS.

tion or unfit for asylum, and concluded that the motion to reopen should be granted. *Id.*

8. The INS appealed the decision of the BIA to me on December 5, 1988.

## II.

The Attorney General has retained the authority to review final decisions of the BIA, 8 C.F.R. § 3.1(h), and he may do so either on his own initiative or upon request. *Id.* § 3.1(h)1(i)-(iii). The relief sought by respondent — reopening of proceedings — is wholly discretionary. The BIA has promulgated regulations governing its consideration of motions to reopen proceedings. *See* 8 C.F.R. §§ 3.2, 3.8, and *infra* note 17. These regulations, however, apply only to the BIA, not to the Attorney General, although of course the Attorney General may refer to these regulations when considering a motion to reopen. The Attorney General's decision is de novo; he is not confined to reviewing for error. His decision is final, *see Deportation Proceedings,* 12 Op. O.L.C. at 4, subject only to judicial review for "abuse of discretion."[8] This is the backdrop against which I consider respondent's motion to reopen.

Respondent relies upon three separate grounds in arguing for reopening of his deportation proceedings.[9] First, in relying upon the BIA opinion, he claims that Attorney General Meese's order that he be deported to the United Kingdom because deportation to Ireland would be prejudicial to the interests of the United States, see *id.* at 6-7, was an unforeseen,

---

[8] *See INS v Rios-Pineda,* 471 U S. 444, 449 (1985); *INS v Jong Ha Wang,* 450 U.S. 139, 144 (1981); *Bahramnia v. INS,* 782 F.2d 1243, 1246 & n.15 (5th Cir), *cert. denied,* 479 U.S 930 (1986); *Garcia-Mir v. Smith.* 766 F 2d 1478, 1490 & n.16 (11th Cir. 1985), *cert denied,* 475 U.S. 1022 (1986); *Muigai v INS,* 682 F.2d 334, 337 (2d Cir 1982), *Schieber v. INS,* 461 F 2d 1078, 1079 (2d Cir. 1972); *Wong Wing Hang v INS,* 360 F.2d 715, 718-19 (2d Cir 1966).

[9] Respondent seeks reopening so that he can request asylum and withholding of deportation. Asylum is discretionary with the Attorney General. *INS v. Stevic,* 467 U.S. 407, 423 n.18, 426 (1984), *INS v. Cardoza-Fonseca,* 480 U S. 421, 444-45 (1987). To be eligible for asylum, the alien must demonstrate that he is a "refugee." 8 U.S.C. § 1101(a)(42)(A). He must show that he is unable or unwilling to return to his country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, group membership, or political opinion — a standard that is lower than the "clear probability" standard in withholding of deportation cases, and that does not require a showing that persecution is more likely than not *Cardoza-Fonseca,* 480 U S. at 432, 449 & n 31 *Ipina v INS,* 868 F.2d 511, 513-14 & n.6 (1st Cir. 1989). The BIA has held that "an applicant for asylum establishe[s] a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution." *Matter of Barrera,* 19 I & N Dec 837, 845 (1989).

Asylum requests made after the institution of deportation proceedings shall also be considered as requests for withholding of exclusion or deportation. 8 C.F.R. § 208.3(b), *Matter of Martinez-Romero,* 18 I & N Dec 75, 77 n 6 (1981), *aff'd, Martinez-Romero v. INS,* 692 F.2d 595 (9th Cir. 1982)

An alien seeking withholding of deportation from any country must show that his "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S C § 1253(h)(1) Withholding of deportation is nondiscretionary It must be granted if the Attorney General finds that the alien would be threatened for any of the five reasons listed in the statute. *INS v Stevic,* 467 U S. at 421 n 15, 426; *Cardoza-Fonseca,* 480 U S at 430 The burden is on the alien to establish a "clear probability" of persecution on any one of the statutory grounds. *INS v Stevic,* 467 U.S. at 430; *Ipina v INS,* 868 F.2d at 515.

7

adverse administrative decision, constituting a "new fact."[10] Second, he claims that, after he admitted deportability and withdrew his claims for asylum and withholding of deportation, there was a change in Irish law as a consequence of the December 1, 1987 implementation of the Extradition Act in Ireland. Specifically, he contends that, if deported to Ireland, the provisions of the Extradition Act would result in his "certain" extradition to the United Kingdom.[11] He argues that, had he known of this subsequent development, he might have made different decisions at his deportation proceedings.

As a third ground for reopening, respondent claims that there is new and material evidence bearing on his deportability that should now be considered. The asserted new evidence consists of (1) a 1988 report by Amnesty International on the British security forces' treatment of suspected IRA members, and other supporting documents; (2) an affidavit from his mother, relating chiefly to the experiences of her family and other republican sympathizers with the British security forces;[12] and (3) affidavits from respondent's counsel.[13]

I do not believe that any of these three arguments justifies reopening respondent's deportation proceedings and, accordingly, I deny the motion.

As to the arguments relied upon by respondent in support of the motion, first, throughout these proceedings, respondent knew that the Attorney General might deny his designation of Ireland as the country to which he would be deported. This authority is expressly reserved to the Attorney General by statute, 8 U.S.C. § 1253(a), and the INS consistently took the position that it would oppose respondent's deportation to any country other than the United Kingdom. It also informed respondent that his deportation to the United Kingdom was a matter of interest at the highest levels of the federal Government. It is clear from the record that respondent made the conscious decision that he would rather be exposed to the risk that the Attorney General would deny his deportation to Ireland than to the risk of extradition directly to the United Kingdom by the United States under the Supplementary Treaty, then in the final stages of ratification.

It is unlikely that the Attorney General's decision to avail himself of his recognized authority to reject a deportee's designation can ever constitute new evidence. It certainly cannot properly be considered new evidence where, as here, deportation to the country designated by the alien

---

[10] Respondent does not make this argument in terms. However, the BIA specifically granted the motion to reopen on the ground that Attorney General Meese's order was, in effect, new evidence. For this reason, I address the argument here.

[11] *See* Brief for Respondent-Appellee to the Attorney General at 14 (April 26, 1989) ("Respondent's Brief").

[12] *See* Affidavit of Mary (Maureen) Doherty, sworn to Dec. 2, 1987 ("M. Doherty Affidavit").

[13] *See* Pike Affidavit, *supra* note 2, Supplemental Affidavit of Mary Boresz Pike, sworn to Aug. 9, 1988 ("Pike Supplemental Affidavit")

has been vigorously contested throughout the proceedings by the federal Government; it has been represented that there is interest at the highest levels of the Government that the alien not be deported to the country designated; and the Attorney General ultimately concludes that the national interests should prevail. Appeal to the Attorney General and decision consistent with the interests of the United States under such circumstances should reasonably be expected. *See* discussion *infra* pp. 12-13.

Second, on the assumption that the implementation of the Extradition Act represented a change in law, it did not change the rules of decision applied by the immigration officials or Attorney General Meese. If the implementation of the Extradition Act represents a change in fact, it is an immaterial change. The Extradition Act gave effect in Irish law to the provisions of the European Convention on the Suppression of Terrorism ("European Convention"), to which the United Kingdom is also a party. The Irish Government expressed its intention to sign the European Convention in November 1985, and did in fact sign it in February 1986. Accordingly, respondent knew or should have known well before December 1, 1987, that Ireland had endorsed the provisions of the European Convention. Furthermore, respondent was subject to extradition to the United Kingdom from Ireland even before Ireland became a party to the European Convention. Thus, Ireland's subsequent adoption and implementation of the Extradition Act did not in itself create a risk of extradition; nor did it materially increase the risk that respondent would be extradited to the United Kingdom. *See* discussion *infra* pp. 13-18.

Third, much of the "new" factual evidence proffered by respondent is not new at all; it was available at the time of the earlier proceedings, and respondent offers no reason for his failure to present it at that time. The evidence that was not available is not material; for the most part, it is cumulative of evidence presented in the earlier proceedings. It does not support the existence of a threat different in character from that known at the time of the deportation proceedings. *See* discussion *infra* pp. 18-20.

Thus, none of the grounds offered for reopening respondent's deportation proceedings is sufficient to warrant reopening.

In addition to finding the arguments advanced in support of reopening insufficient, I would, in the exercise of my discretion and as an independent basis for decision, deny the motion to reopen on the ground that respondent explicitly waived his claims to asylum and withholding of deportation as part of a calculated plan to ensure immediate deportation to Ireland before the United Kingdom ratified its treaty with the United States, which would have allowed respondent to be extradited directly to the United Kingdom. *See* discussion *infra* Part IV.[14] The integrity of the administrative process dictates that a deportee who, with the advice and

---

[14] *Cf Communication Workers of Am., Local 5008 v. NLRB*, 784 F 2d 847, 851 (7th Cir. 1986) (court must sustain administrative decision if any of the independent grounds that support the decision is correct).

assistance of counsel, makes such deliberate tactical decisions, not be permitted to disown those decisions merely because they ultimately result in action adverse to his interests. This is especially the case where the possibility of that action was not only foreseeable but foreseen.

Finally, I also deny respondent's motion to reopen on the unrelated ground that respondent would not ultimately be entitled to either asylum, the discretionary relief he seeks, or withholding of deportation, the nondiscretionary relief he seeks. *See* discussion *infra* Part V.[15]

Respondent simply has not carried the heavy burden of showing either that he is entitled to reopen his deportation proceedings or that, as a matter of discretion, he should be allowed to do so. The record reveals clearly that respondent made deliberate, well-informed, tactical decisions throughout the proceedings to ensure deportation, if at all, to the country of his choice; that he recognized and knowingly assumed the risks that attended each decision; and that all that has happened is that the risks he recognized have in fact materialized. That which the Supreme Court said in the context of a similar attempt to rescind a litigating decision in an immigration proceeding is applicable to respondent:

> His choice was a risk, but calculated and deliberate and such as follows a free choice. [Respondent] cannot be relieved of such a choice because hindsight seems to indicate to him that his decision ... was probably wrong.... There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

*Ackermann v. United States*, 340 U.S. 193, 198 (1950).[16]

### III.

I turn first to the claims that respondent should be permitted to reopen his deportation proceedings because of (1) the unexpected, adverse decision of Attorney General Meese ordering him deported to the United Kingdom, (2) the supervening implementation in Ireland of the Extradition Act, *see* Respondent's Brief, *supra* note 11, at 14; Pike

---

[15] *See supra* note 14.

[16] *See also Ballenilla-Gonzalez v INS*, 546 F.2d 515, 520 (2d Cir 1976) (alien's waiver of claimed right to counsel was binding, despite her mistaken impression of the law, denial of motion to rehear upheld), *cert. denied*, 434 U S. 819 (1977), *Small v. INS*, 438 F.2d 1125, 1128 (2d Cir 1971) (alien's waiver through counsel of right to present further evidence at new hearing was binding; deportation order affirmed); *La Franca v. INS*, 413 F.2d 686, 690 (2d Cir 1969) (no reason to reopen proceeding to permit alien to try to establish eligibility for voluntary deportation where alien's counsel had previously waived request for hearing on voluntary departure); *Matter of M-*, 5 I & N Dec. 472, 474 (1953) (counsel's decision not to file application for suspension of deportation during pendency of deportation hearing was analogous to error of judgment in conduct of defense, since filing became untimely, denial of motion to reopen would not violate due process; motion was granted "purely as a matter of grace").

Affidavit, *supra* note 2, at paras. 24-28; and (3) the affidavits, book and report submitted by respondent. These events are portrayed as "new facts" warranting a reopening of proceedings. The BIA held that Attorney General Meese's order justified reopening and permitting respondent to withdraw his prior waivers of claims to asylum and withholding of deportation. *See* Respondent's Brief, *supra* note 11, at 9 & n.5. Respondent raised, but the BIA was not required to decide, the question of the effect of the Extradition Act because of its holding that Attorney General Meese's order was alone sufficient grounds upon which to reopen. *See Matter of Doherty*, No. A26 185 231, slip op. at 5-6 (BIA Nov. 14, 1988). The BIA suggested, but did not explicitly hold, that the affidavits and books would be sufficient to justify reopening. *Id.* at 6.

Deportation proceedings may be reopened by the BIA on the basis of new evidence if the evidence "is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 3.2.[17] A motion to the BIA to reopen a deportation proceeding on the basis of previously unavailable evidence is "appropriate[ly] analog[ized]" to "a motion for a new trial in a criminal case on the basis of newly discovered evidence, as to which courts have uniformly held that the moving party bears a heavy burden." *INS v. Abudu*, 485 U.S. 94, 110 (1988). Motions to reopen deportation proceedings on this ground are plainly "disfavored," *id.* at 107,[18] for reasons "comparable to those that apply to petitions for rehearing, and to motions for new trials on the basis of newly discovered evidence." *Id.* (footnotes omitted).[19] Generally, a motion to reopen on the grounds of new evidence will not prevail unless the proffered evidence is such that it probably would change the outcome of the prior proceeding.[20]

---

[17] "Motions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material." 8 C F.R § 3 8 "Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing " *Id* at § 3 2.

Similarly, a motion to the immigration judge for reopening pursuant to 8 C.F.R § 242.22 "will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing." Except as otherwise provided, a motion to reopen under 8 C F.R § 242 22 "shall be subject to the requirements of § 103.5," which states in part that "a motion to reopen shall state the new facts to be proved at the reopened proceeding and shall be supported by affidavits or other evidentiary material." 8 C F.R. § 103 5(a). A motion to reopen pursuant to 8 C F.R. § 208.11 on the basis of an asylum request "must reasonably explain the failure to request asylum prior to the completion of the    . deportation proceeding." *See also Ghosh v. Attorney General*, 629 F2d 987, 989 (4th Cir 1980), *Matter of Haim*, 19 I & N Dec 641 (1988), *Matter of Lam*, 14 I & N Dec. 98, 99 (1972).

[18] *See also INS v  Jong Ha Wang*, 450 U.S. 139, 143 n.5 (1981) (regulatory language disfavors reopening).

[19] Failure to introduce previously available, material evidence, 8 C F R § 3.2 (or, in an asylum application case, failure to reasonably explain the failure to apply for asylum initially, 8 C.F.R § 208 11), is an independent ground upon which the BIA may deny a motion to reopen. *INS v. Abudu*, 485 U S  at 104

[20] *See United States v. Agurs*, 427 U.S  97, 111 & n 19 (1976) (standard is generally applied on motions for new criminal trials), *Philip v  Mayer, Rothkopf Indus , Inc*, 635 F2d 1056, 1063 (2d Cir 1980) (no new trial in civil case where movant's post-trial evidence would not "change our result here"); *United States v. Slutsky*, 514 F2d 1222, 1225 (2d Cir 1975) (post-trial evidence must be "so material that it would probably produce a different verdict"), *United States v  On Lee*, 201 F2d 722, 724 (2d Cir.) (same), *cert. denied*, 345 U.S. 936 (1953)

11

While the BIA standards apply only to the BIA, not to the Attorney General, I refer to them in my consideration of the arguments made for reopening in this part because I believe they embody neutral inquiries that go directly to the issue of the applicant's justification for asking for, and the administrative system's justification for allowing, the reopening of proceedings previously closed.

Under these standards, I do not believe that either Attorney General Meese's decision or the implementation of the Extradition Act warrants reopening of respondent's deportation proceedings. Neither constitutes previously unobtainable material evidence as required by the regulations, *see* 8 C.F.R. §§ 3.2, 3.8, 242.22, nor a reasonable justification for permitting respondent to withdraw his waiver of his claim for asylum. *Id.* § 208.11.[21]

1. Attorney General Meese's June 9 order cannot properly be considered a "new fact." While the actual fact of the order is in some sense "new," the possibility that the Attorney General would refuse to accept respondent's designation of Ireland as the country to which he wanted to be deported was known, or should have been known, throughout the proceedings.

The authority of the Attorney General, in his discretion, to deny deportation to the country designated by an alien is plain on the face of the same statute that gives the alien the right to designate the country to which he wishes to be deported:

> The deportation of an alien in the United States provided for in this chapter, or any other Act or treaty, shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, *unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States.*

8 U.S.C. § 1253(a) (emphasis added). Given this explicit reservation of authority and its appearance in the very same sentence that accorded

---

[21] It is unnecessary for me to address (and I do not) the question whether respondent has established a prima facie case for the substantive relief sought. The Attorney General may decide not to reopen a deportation proceeding, even if the movant establishes a prima facie case for granting asylum or withholding of deportation. *See INS v. Abudu*, 485 U.S at 105-07 (holding that motion to reopen may be denied in an asylum case if alien fails reasonably to explain failure to file asylum claim initially, and stating that "the BIA has discretion to deny a motion to reopen even if the alien has made out a prima facie case for relief" and that "in a given case, the BIA may determine . . as a sufficient ground for denying relief . . whether the alien has produced previously unavailable, material evidence (§ 3 2)"); *see also INS v. Rios-Pineda*, 471 U.S at 449 ("even assuming that respondents' motion to reopen made out a prima facie case of eligibility for suspension of deportation, the Attorney General had discretion to deny the motion to reopen"), *INS v. Jong Ha Wang*, 450 U S at 144 n.5 (8 C F.R. § 3.8 "does not affirmatively require the Board to reopen the proceedings under any particular condition"); *Bahramnia v. INS*, 782 F.2d at 1249, *Yousif v. INS*, 794 F 2d 236, 241 (6th Cir 1986); *Ahwazi v. INS*, 751 F.2d 1120, 1122 (9th Cir 1985), *Matter of A- G-*, 19 I & N Dec. 502 (1987), *Matter of Barocio*, 19 I & N Dec. 255 (1985).

12

respondent the right to designate Ireland his country of deportation, it is inconceivable that anyone represented by counsel could not know that there always existed a risk that the Attorney General would deny respondent's deportation to Ireland to protect the interests of the United States.

Even if the possibility of denial by the Attorney General were not so clear from the face of the statute alone, it should have been evident from the position taken by the Government from the outset of the proceedings. At the September 12, 1986, hearing at which respondent designated Ireland as his country of deportation, counsel for the INS objected to that designation, and stated that the INS would take the position that deportation to any country other than the United Kingdom would be prejudicial to the interests of the United States. Transcript of Sept. 12 Hearing, *supra* note 2, at 41-43, 47-48. The INS even represented that there was interest at the highest levels of the federal government in having respondent deported to the United Kingdom. *Id.* at 47 ("[T]his matter is of some concern at the highest levels of government and ... was under consideration by the legal advisor to the State Department and will be under the personal review of Attorney General Meiss [sic] this coming week.").

Given these representations by the INS, respondent clearly should have understood, if he did not, that "[a]fter the BIA determination, the case might ultimately be referred to the Attorney General at his request, at the request of the Chairman or a majority of the BIA, or at the request of the Commissioner of the INS." *Doherty v. Meese*, 808 F.2d at 942. Contrary to the conclusion of the BIA, *Matter of Doherty*, No. A26 185 231, slip op. at 6 (BIA Nov. 14, 1988), once this possibility was acknowledged, respondent reasonably should have known (again, if he did not) that the Attorney General ultimately might forbid deportation to Ireland. The ultimate decision in an administrative process cannot itself constitute "new" evidence to justify reopening. If an adverse decision were sufficient, there could never be finality in the process.

2. Respondent also characterizes Ireland's implementation of the Extradition Act, and specifically the provisions permitting extradition to the United Kingdom, as a supervening change requiring reopening of the proceedings. He terms this asserted change "the watershed event," Respondent's Brief, *supra* note 11, at 11-12, "the gravamen of [his] motion to reopen," *id.* at 14, and "[t]he event warranting the motion," Pike Affidavit, *supra* note 2, at para. 5.[22] For the reasons below, I do not believe that implementation of the Extradition Act was a "new fact." Moreover, even assuming that it was new and did represent a change in

---

[22] At one time, respondent suggested that the change in Irish law was the sole cause of his motion *See* Reply Brief of Respondent-Appellee to Opposition to Respondent's Motion to Reopen or To Reconsider at 6 (Apr. 22, 1988) ("The cause of [respondent's motion's] December 3, 1987, filing was the implementation on December 1, 1987, of the Extradition Act. No grounds for its filing existed until December 1, 1987, respondent can hardly be faulted for not having filed it prior to that date ") (footnote omitted)

13

Irish law, it is irrelevant, given that Attorney General Meese ordered respondent deported to the United Kingdom, not Ireland.

It is plain that implementation of the Extradition Act was not a "new" fact. In the Anglo-Irish Agreement entered into at Hillsborough, Northern Ireland on November 15, 1985, the Irish Government expressed its intention "to accede as soon as possible to the European Convention on the suppression of terrorism." Ireland-United Kingdom: Agreement on Northern Ireland, Nov. 15, 1985, 24 I.L.M. 1579, 1581. Ireland signed the European Convention on February 24, 1986, *see, e.g., Ireland Signs Terrorism Convention,* Fin. Times, Feb. 25, 1986, § 1, at 4, more than six months before respondent withdrew his applications for asylum and for withholding of deportation and conceded deportability. *See* discussion *supra* pp. 3-4. Both the November 1985 Anglo-Irish Agreement and Ireland's February 1986 signing of the European Convention were widely publicized. *See, e.g., Fitzgerald Discusses Anglo-Irish Pact, U.S. Aid,* Ir. Echo, Mar. 22, 1986, at 6; Holland, *Ireland to Sign Anti-Terrorist Convention,* Ir. Echo, Mar. 1, 1986, at 2; *Complete Text of Anglo-Irish Agreement on Ulster,* The Times (London), Nov. 16, 1985, at 4. Respondent, having expressly based his designation on a counseled understanding of Irish extradition laws, is properly chargeable with knowledge of Ireland's signing of the European Convention.

The Extradition Act, which gave effect in Irish law to the European Convention and amended the Extradition Act of 1965, was passed on January 21, 1987. Extradition (European Convention on the Suppression of Terrorism) Act, No. 1 (1987). Section 13 of the Extradition Act provided that its implementation was suspended until December 1, 1987, subject to the condition that resolutions of both Houses of the Irish Parliament could bring it into force at an earlier date or provide for further postponement. *Id.* § 13.[23] In sum, "the watershed event" upon which respondent relies was neither sudden nor unforeseeable. Instead, it was the logical culmination of a lawmaking process that had been set in motion more than two years prior to December 1, 1987.

Even were the fact of the Extradition Act "new," it would not justify reopening of the deportation proceedings. A supervening change in the law does not generally constitute a reason for granting a new trial or for amending a judgment, even if the litigant has abandoned a claim or defense that might be meritorious in light of the change.[24] And, as noted, a change in law that would not constitute grounds for a new trial ordi-

---

[23] Pursuant to section 13, the Extradition Act was automatically implemented on December 1, 1987. Acceleration or postponement of the implementation date, however, would not have affected the Extradition Act's applicability to respondent. By its terms, the Extradition Act applies to offenses committed or alleged to have been committed "before or after" the date of passage, January 21, 1987. Extradition Act at § 1(4)

[24] *See* Fed R. Civ P. 59(a), *Del Rio Distrib , Inc. v Adolph Coors Co ,* 589 F 2d 176, 178-79 (5th Cir.), *cert denied,* 444 U.S. 840 (1979)

narily does not justify reopening deportation proceedings. *INS v. Abudu*, 485 U.S. at 913-14. Some courts have held that an exception to this general rule against a new trial exists where the change in law would affect the rule pursuant to which the prior decision was made. *See, e.g., United States v. Bank of America Nat'l Trust & Sav. Ass'n*, 51 F. Supp. 751, 751 (N.D. Cal. 1943). *But see McMann v. Richardson*, 397 U.S. 759, 774 (1970). Here, however, the Extradition Act did not alter the rules of decision applied by the immigration judge or the Attorney General in either the section 1253 proceedings or the asylum and withholding of deportation proceedings. As to the former, the immigration judge and Attorney General Meese ordered respondent deported to Ireland and the United Kingdom, respectively, based upon their assessments of the foreign policy interests of the United States. The interests of the United States, and the compatibility of deporting respondent to either country with those interests, are the same now as they were prior to the implementation of the Extradition Act. As to the latter, the Extradition Act could not have and did not change the standards that apply to respondent's asylum and withholding of deportation claims under the statutes of the United States. Accordingly, any change in law wrought by the Extradition Act does not call into question the legal correctness of the decisions that were made by either the immigration officials or Attorney General Meese.

Respondent presumably would argue that, if not a change in law, the implementation of the Extradition Act must represent a change in fact justifying reopening of the proceedings because the Extradition Act expressly provides for extradition by Ireland to the United Kingdom. This argument, too, is unpersuasive.

I do not believe that the Extradition Act's provisions, as they relate to respondent, represent a change in fact that would warrant reopening these deportation proceedings. Respondent was extraditable by Ireland to the United Kingdom before the Extradition Act was implemented; he would be extraditable under the Extradition Act. Indeed, respondent himself repeatedly emphasized the serious risk of extradition by Ireland before passage of the Extradition Act in arguing for affirmance of the immigration judge's order that he be deported to Ireland.[25] For example, in his December 1986 brief, he states, "the Service fails to note that decisions of the Irish Supreme Court are viewed as having vitiated the political offense exception, thereby removing any obstacle to respondent's extradition from Ireland to Northern Ireland. *See, e.g., McGlinchey v. Wren*, 3 Ir. L. Rep. Monthly 169 (1982)." Brief for Respondent Appellee Joseph Patrick Thomas Doherty at 16 (Dec. 19, 1986). In the Doherty

---

[25] *See* Doherty Petition, *supra* note 2, at paras 53-54, Brief for Respondent-Appellee Joseph Patrick Thomas Doherty at 16 (Dec 19, 1986), Reply of Respondent to Opposition of the INS to Respondent's Motion for Summary Dismissal at 7 n 5 (Oct. 27, 1986), Brief for Appellant John Patrick Thomas Doherty at 14 (Oct 2, 1986)

Petition, *supra* note 2, at paras. 53-54, respondent's attorney, Stephen Somerstein, stated:

> The Republic of Ireland ... has extradition arrangements with the United Kingdom and has recently extradited to Northern Ireland individuals who had raised the political offense exception as a defense to their extradition, but were found by the Irish courts to be non-political offenders. Upon his deportation to Ireland, Mr. Doherty is subject to extradition from Ireland to Northern Ireland pursuant to a request therefor by the English government. His case will be considered by the courts of the Republic of Ireland pursuant to the well established law of that country in an historical context but best understood by the Irish and British themselves.

The only difference since implementation of the Extradition Act appears to be that extradition is now expressly provided for by statute, whereas previously extradition was simply ordered on the basis of less formal "extradition arrangements" between the United Kingdom and Ireland. *See* Doherty Petition, *supra* note 2, at para. 53. Given that respondent faced a serious risk of extradition by the United Kingdom before implementation of the Extradition Act, it cannot be said that the mere express provision for extradition in the statute constitutes new evidence.

Respondent claims that the Extradition Act transformed "the possibility of [his] removal from Ireland to the United Kingdom ... into a certainty." *See* Respondent's Brief, *supra* note 11, at 14. Respondent's effort to minimize the risk of deportation by Ireland before implementation of the Extradition Act contradicts the statements that he made before the BIA in defense of the immigration judge's order deporting him to Ireland. *See* discussion *supra* note 25.

Furthermore, it is unsupported by the provisions of the Extradition Act itself which, incorporating the terms of the European Convention, provide for denial of extradition where

> there are substantial grounds for believing that —
>
> ...
>
> (ii) the warrant was in fact issued for the purpose of prosecuting or punishing (the person named) on account of his race, religion, nationality or political opinion or that his position would be prejudiced for any of these reasons.

Extradition (European Convention on the Suppression of Terrorism) Act, No. 1 § 8 (1987); *see also id.* § 9. Thus, existing Irish law explicitly pre-

serves for respondent the right to raise essentially those claims that he would have relied upon under pre-existing Irish law. Accordingly, if respondent has a meritorious claim that extradition to the United Kingdom by Ireland would result in persecution, he could raise that claim today before Irish officials who, as respondent has previously suggested, *see* discussion *supra* p. 15, would view his claim with greater understanding.[26] The reasonable inference therefore is that respondent cannot credibly maintain now that the change in Irish law has made his return to the United Kingdom inevitable, and that, as a consequence, he should be permitted to reopen and redesignate a country other than Ireland.[27]

Respondent's argument on the Extradition Act comes down to the fact that he believes that he will be given a more sympathetic hearing on an asylum or withholding of deportation claim in this country than he would receive on a denial of extradition claim in his own country. Absent reason to think that respondent will not receive a fair hearing in his home courts of Ireland, this is simply not a basis for reopening his deportation proceedings.

I would reject respondent's claim based upon implementation of the Extradition Act on a separate and independent ground: even if I agreed that the Extradition Act was a new fact and constituted a change in Irish law, I believe that any change in Irish law is irrelevant. Attorney General Meese determined that it would be against the interests of the United States to deport respondent to Ireland, and in furtherance of our national interests to deport him to the United Kingdom where he could be

---

[26] Indeed, there is reason to believe that the Extradition Act has actually enhanced the defenses available to an individual seeking to resist extradition from Ireland to the United Kingdom. Under the Extradition (Amendment) Act, No 25 (1987), the Attorney General of Ireland is prohibited from endorsing for execution an arrest warrant under the Extradition Act unless he is of the opinion that "there is a clear intention to prosecute or .. continue the prosecution of, the person named or described in the warrant concerned for the offence specified therein" in the country seeking extradition, and "such intention is founded on the existence of sufficient evidence " *Id* § 2(1)(a). Furthermore, extradition may also be refused on the grounds that, "by reason of the lapse of time since the commission of the offence . or the conviction of the person named .. and other exceptional circumstances, it would ... be unjust, oppressive or invidious to deliver him up " *Id* § 2(1)(b). At least one recent study indicates that the Extradition Act does not go as far as the Irish Supreme Court has gone in circumscribing the political offense exception. Gerard Hogan & Clive Walker, *Political Violence and the Law in Ireland* 292-93 (1989)

The actual administration of Irish extradition law after the implementation of the Extradition Act also suggests that it is less than certain that respondent would be extradited to the United Kingdom were he deported to Ireland. On December 13, 1988, the Attorney General of Ireland issued a statement rejecting a request by the government of the United Kingdom to extradite the suspected PIRA terrorist Patrick Ryan, whom the British authorities wished to try for alleged terrorist activities, including conspiracy to murder, possession of explosives, and conspiracy to cause explosions. *See, e g.*, Sheila Rule, *Irish Deny British Bid to Extradite Priest Suspected of Aiding I.R.A.*, N.Y. Times, Dec. 14, 1988, at A3 In view of the Irish Attorney General's decision not to comply with that extradition request, it seems entirely possible that a request to extradite respondent from Ireland might also be rejected

[27] Even were I to assume that implementation of the Extradition Act increased the risk that respondent would be extradited to the United Kingdom from Ireland, I would not grant the motion to reopen respondent's proceedings. Any change in the risk of extradition would necessarily be immaterial, given that the risk was "serious" before implementation of the Extradition Act and is no more than serious (*i.e.*, not certain) today

17

promptly punished for the crimes he has committed. *Deporation Proceedings*, 12 Op. O.L.C. at 6-7. Unless I overturn Attorney General Meese's order, which I have no reason to do, a change in Irish law has no effect upon respondent. Respondent cannot be deported to Ireland because of the extant determination that that would be contrary to the interests of the United States, and he cannot claim asylum against deportation to the United Kingdom because he assumed the risk of deportation to the United Kingdom when he designated Ireland. *See* discussion *supra* pp. 12-13. This is unlike the situation where an alien designates a particular country and there is a subsequent change in the country that increases the likelihood of his persecution in that country. In that circumstance, the alien may be harmed by the change because he is being deported to the country in which the change occurred. Here, in contrast, assuming arguendo that there was a change in Irish law, that change cannot affect respondent because he is not going to be deported to Ireland.

3. Respondent also urges reopening on the ground that he is proffering new evidence in the form of affidavits and documents. This evidence is not both material and previously unobtainable. *See* 8 C.F.R. §§ 3.2, 242.22.[28] "When an alien has already had one full deportation hearing, with all the procedural rights accompanying it, ... he or she may have it reopened only upon a showing of significant new evidence." *Acevedo v. INS*, 538 F.2d 918, 920 (2d Cir. 1976) (per curiam). Substantially all of the evidence submitted by respondent is either cumulative of that which he has previously presented, discoverable long ago, or not material in light of the evidence that was presented. None of the evidence supports existence of a threat of persecution of which respondent was unaware or a material change in the character of a threat previously recognized.

(a) Respondent proffers certain documents, including a report by Amnesty International, *United Kingdom/Northern Ireland: Killings by Security Forces and "Supergrass" Trials* (1988) ("Amnesty Report"), and a book relied on by Amnesty International in its report, John Stalker, *The Stalker Affair* (1988); by the former Deputy Chief Constable of the Greater Manchester (U.K.) Police Force, which he maintains contain new evidence of the threat he faces by deportation.[29] Both the Amnesty Report and the Stalker book focus on allegations that British security forces have killed or wounded unarmed individuals suspected of membership in republican armed opposition groups, as part of a government policy of eliminating rather than arresting such individuals. The incidents of "particular concern" to Amnesty International were "the killings of six

---

[28] The BIA provided no analysis to support its conclusory assertion that "respondent has submitted recently published background evidence which we find to be material to the respondent's case." *Matter of Doherty*, No. A26 185 231, slip op. at 6 (BIA Nov. 14, 1988) Nor did Board Member Heilman provide any analysis of these materials in his concurring opinion.

[29] The contents of these documents are summarized by respondent's counsel in the Pike Supplemental Affidavit, *supra* note 13

unarmed persons in late 1982." Amnesty Report at 7; *see id.* at 17-25 (discussing the 1982 events). Information concerning these events was available to respondent well before he brought his motion to reopen, and indeed even before he withdrew his claims for asylum and withholding of deportation in September 1986. *See Matter of Lam*, 12 I & N Dec. 696 (1968).[30] Thus, although the Amnesty Report itself first appeared in 1988, respondent could, with due diligence, have presented significant amounts of the information contained in it at a much earlier stage of these proceedings.[31] He offers no reasonable explanation for his failure to do so.

(b) Respondent also proffers an affidavit from his mother, describing her family's dealings with the British security forces, and with Ulster "unionist" elements outside the government.[32] Even accepting as true the recitals set forth, the affidavit merely presents evidence that was discoverable earlier. Again, he offers no explanation as to why he did not proffer the evidence during any of the earlier proceedings.[33]

Moreover, the evidence is essentially cumulative of that offered previously. The theme of the affidavit is that a longstanding pattern of conduct by British military and police forces in Northern Ireland, coupled with the violent activities of pro-unionist elements among the Protestant population, indicates the presence of danger to suspected republican sympathizers generally, and particularly to the respondent and his family.[34] This claim, and indeed much of the evidence cited to support it, is substantially the same as that presented by respondent when he first claimed relief in June 1983; it does not suggest existence of either a new source

---

[30] *Lam* is closely analogous to this case In *Lam*, the BIA denied a concededly deportable alien's motion to reopen in order to withdraw his designation of Hong Kong as his country of deportation, and to permit him to apply for temporary withholding of his deportation thereto The alien claimed that he should have been given the opportunity to withdraw his designation because of Communist riots that broke out in Hong Kong in May 1967 He contended that he had fled from mainland China as a refugee from Communism, and that the riots gave rise to a fear that he would be persecuted by the Communists if he were sent to Hong Kong. The BIA denied his motion, in part because his evidence was not previously unobtainable. the movant could have advanced his claim for asylum in a July 1967 hearing, *i e.*, two months after the riots, but had not done so

[31] Amnesty International's concerns over the causes of the incidents against Irish republic groups do not bear on the treatment of individuals held in prison for criminal activities Assuming for the purposes of this motion that British security forces have on occasion sought to kill suspected republican opposition members who were outside their custody, it does not follow that an individual actually in the keeping of British forces would also be exposed to such a threat.

[32] The affidavit's references to the conduct of nongovernmental "unionist" elements relate generally to the unstable conditions in Northern Ireland, but do not substantiate a claim that he would be threatened by persecution at the hands of British governmental authorities *Cf Matter of A- G-*, 19 I & N Dec 502, 506 (1987)

[33] The affidavits of respondent's counsel, *supra* notes 2-3, also fail to provide previously unobtainable maternal evidence. The pertinent facts recited therein are found elsewhere in respondent's submissions or are otherwise matters of record

[34] The danger indicated, it should be noted, need not be understood as a danger of *persecution* The lawful use of force by authorized officials which is reasonably aimed at detecting, preventing, or punishing criminal activity does not support a claim of persecution The affiant's statement does not attempt to distinguish such activity on the part of the British military and police from the other types of conduct she describes.

19

of persecution or a heightened danger of persecution from an existing source which respondent did not previously apprehend.[35] In fact, substantial portions of Mrs. Doherty's affidavit relate to matters which occurred even before respondent withdrew his claims for asylum and withholding of deportation.[36] Other events of more recent occurrence, although they may comprise information not previously available to respondent, are not sufficiently material to warrant reopening.[37]

## IV.

I am also exercising my discretion to deny respondent's motion to reopen on the independent ground that he knowingly and intelligently waived any claim that he might have had to asylum and withholding of deportation.

In my judgment, at least in this particular case, the interests in the integrity of the administrative process and finality of decision should pre-

---

[35] *See Ganjour v. INS*, 796 F 2d 832, 838 (5th Cir 1986) (application for reopening untimely where based on information from telephone call by alien's sister in Iran predating immigration hearing and appeal); *Young v INS*, 759 F 2d 450, 456-57 (5th Cir.) (affidavit stating that alien's daughter had recently been arrested and interrogated about him by Guatemalan police was cumulative of prior evidence), *cert denied*, 474 U.S. 996 (1985), *cf. Bernal-Garcia v. INS*, 852 F.2d 144, 146-47 (5th Cir 1988) (new evidence consisted of letter received after conclusion of deportation proceedings relating previously unknown death threat made two weeks earlier), *Ananeh-Firempong v. INS*, 766 F 2d 621, 626 (1st Cir 1985) (supporting affidavits described political events "that, in relevant part, had not occurred until [after (movant's)] earlier deportation proceedings had concluded").

[36] *See* M. Doherty Affidavit, *supra* note 12, at paras. 1-20, 22-23, 25-27, 36-38 (relating information, substantially all of which was available prior to respondent's withdrawal of his claims for asylum and withholding of deportation on September 12, 1986) Thus, for instance, the affiant's accounts of arrest, trial, and acquittal of respondent's sister on a charge of murder in 1983, *see id* at para 20, or of subsequent events in 1985 and 1986 involving her daughter and of the man with whom her daughter lives, *see id.* at paras. 23-28, would appear to have been available to respondent well before his waiver of his asylum claim. Indeed, in his 1983 application for asylum, respondent referred to arrests of his mother, father, and three sisters at various times in the *prior twelve* years, and to the bombing of his family's house *in 1974* by what he described as a "quasi-official Protestant group." *See* Respondent's Application for Political Asylum, signed June 27, 1983. Much of respondent's mother's affidavit simply elaborates on or adds detail to such allegations.

[37] For example, the affiant states that her son-in-law had been arrested about five weeks before she made out her affidavit, and that while he was detained, the police "made abusive remarks to him" about respondent. M. Doherty Affidavit, *supra* note 12, at para. 35 Again, for example, the affiant states that on two unidentified occasions on which her daughter was detained by the police, "the interrogators talked about [respondent] and what would be done to him upon his return" *Id.* at para. 24 Such evidence is not different in tenor from the allegations respondent made when originally claiming asylum in 1983. Furthermore, the statements attributed to the security personnel are ambiguous. Bearing in mind that respondent has been convicted of a murder, "abusive" statements about him by the police, or statements about "what would be done to him" if he were returned, do not have to be understood as implied threats of persecution on forbidden grounds.

Other submissions by the affiant concern, for example, the exposure of an alleged conspiracy in September 1987 by nongovernmental "unionist" elements to murder Anthony Hughes, the man with whom affiant's daughter lives. *Id.* at paras. 31-32. Such evidence is not relevant to establishing that the respondent would have a well-founded fear of persecution at the hands of *governmental* authorities, or that they would threaten him with loss of life or freedom for proscribed reasons.

Finally, other parts of affiant's statements, *e.g.*, *id.* at para. 40, are cumulative of evidence submitted elsewhere in this motion

20

vail over whatever interest respondent has in withdrawal of his calculated waivers because of an unfavorable decision, which was clearly foreseeable at the time. [38]

Respondent expressly conceded deportability and withdrew his claims to asylum and withholding of deportation on September 12, 1986. He did so on the record, through counsel, in response to a direct question from the immigration judge as to whether he intended to waive these claims. *See* discussion *supra* pp. 3-4. By any standard, respondent's decision was an intentional relinquishment of any right to claim asylum relief from deportation. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Further, it was a knowing waiver. It was calculated in an attempt to avoid extradition directly to the United Kingdom under a treaty between the United States and the United Kingdom soon to be ratified. *See Doherty v. Meese*, 808 F.2d at 940. It appeared likely at the time that the United Kingdom would ratify its treaty with the United States, which could have provided for respondent's direct extradition to the United Kingdom, before any decision could be made on asylum or withholding of deportation. Facing imminent ratification of this treaty, respondent chose to leave the United States as quickly as possible, rather than risk direct extradition to the United Kingdom in the event the treaty were ratified. *See id.* (respondent "urgently want[ed]" to escape the effects of the then-pending Supplementary Treaty). When he chose to waive any claims to asylum and withholding of deportation to avoid the possibility of direct extradition to the United Kingdom, he assumed the risk that Attorney General Meese might deny deportation to Ireland, whatever risks to him that existed at the hands of the Irish, and the risk that the move then underway to obtain ratification of Ireland's treaty with the United Kingdom would prove successful.

This tactical decision by respondent was fully within his rights. However, when he made this decision, he assumed the risk that he would be denied his request to be deported to Ireland, and required to go elsewhere. *See* discussion *supra* pp. 12-13. The fact that respondent's attempt to work the regulatory process to his advantage failed, should not, absent exceptional circumstances, relieve him of the consequences of the decisions made in the attempt to work the process to his advantage.[39] The Supreme Court has observed that courts "cannot permit an accused to

---

[38] Again, here, as in Part III *supra*, I need not and do not decide whether respondent can make out a prima facie case for the substantive relief sought. *See supra* note 21

[39] Respondent's concession of deportability and withdrawal of any claim to relief is analogous to a guilty plea "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary" *United States v. Broce*, 488 U.S 563, 569 (1989). *See also Brady v United States*, 397 U.S 742, 757 (1970) ("A defendant is not entitled to withdraw his plea [of guilt] merely because he discovers long after [it] has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action.").

elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at the trial be reopened to him. However unwise the first choice may have been, the range of waiver is wide." *Johnson v. United States*, 318 U.S. 189, 201 (1943).[40] So here, respondent's tactical decisions should not be revocable merely because later events did not unfold as he wished. If we were not to give near-preclusive effect to an express waiver under circumstances such as exist here, the regulatory process could be manipulated at will by litigants making and withdrawing waivers *ad libitum*, at the expense of the fair and expeditious administration of meritorious deportation claims.

## V.

I also deny the motion on the separate ground that respondent would not ultimately be entitled either to the discretionary relief of asylum or to withholding of deportation.

1. I deny the motion to reopen to permit the claim of asylum because, in my view, respondent would not ultimately be entitled to this discretionary relief, *INS v. Abudu*, 485 U.S. at 105, even if he could now establish a prima facie case for such relief.[41]

The grant of asylum is discretionary with the Attorney General.[42] In my discretion, I would not grant the respondent asylum. First, it is "the policy of the United States that those who commit acts of violence against a democratic state should receive prompt and lawful punishment." *Deportation Proceedings* 12 Op. O.L.C at 6. Deporting respondent to the United Kingdom would unquestionably advance this important policy. *See id.* at 5-6. Second, the United States Government, through the State Department, has specifically determined that it is in the foreign policy interests of this country that respondent be deported to the United Kingdom. *Id.* at 6-7. Third, respondent knowingly and intentionally waived his claim to asylum, and for the reasons explained in Part IV, *supra*, I would not permit withdrawal of that waiver. Fourth, I believe that respondent's membership in and assistance of the PIRA in its acts of persecution, and the nature and number of his criminal acts in general, *see* discussion *supra* pp. 1-2, suggest that he is not deserving of equitable relief.

2. I also deny the motion for reopening to permit respondent to raise a

---

[40] *See also United States v. Prince*, 533 F.2d 205 (5th Cir. 1976) (antitrust defendants not permitted to withdraw *nolo contendere* pleas, made after consulting counsel, when sentences proved harsher than expected).

[41] Insofar as respondent also requests reopening to enable him to seek the nondiscretionary relief of withholding of deportation, I conclude, for the reasons set forth *infra* pp. 22-27, that respondent is statutorily ineligible for that relief.

[42] *See INS v. Stevic*, 467 U.S. at 421 n 15, 426; *INS v. Cardoza-Fonseca*, 480 U S. at 443-45. The discretionary authority of the Attorney General is not restricted to the enumerated grounds which compel an INS district director to deny asylum 8 C.F.R. § 208 8(f)(i)-(vi)

sustain an argument that, upon deportation, his "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion" within the meaning of 8 U.S.C. § 1253(h)(1), he would be ineligible, on two separate grounds, for nondiscretionary withholding of deportation under 8 U.S.C. § 1253(h)(2)(A), (C).

(a) Subsection 1253(h)(2)(C) provides that the prohibition on deportation in § 1253(h)(1) is inapplicable where "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States."[43] By its terms, this subsection does not require the Attorney General to find that an alien has actually committed a serious nonpolitical crime, but merely to find that there are serious reasons for *considering* that an alien has committed such a crime. *See McMullen v. INS*, 788 F.2d 591, 596-99 (9th Cir. 1986). In conferring this latitude on the Attorney General, the statute recognizes that cases involving alleged political crimes arise in myriad circumstances, and that what constitutes a "serious nonpolitical crime" is not susceptible of rigid definition. As one commentator has observed, "[i]n practice, characterization of an offence as 'political' is left to the authorities of the state," and "the function of characterization itself is ... one in which political considerations will be involved." Guy S. Goodwin-Gill, *The Refugee in International Law* 35 (1983).

In *McMullen v. INS*, 788 F.2d 591 (9th Cir. 1986), the court set forth an analytical framework for determining whether an alien has committed a "serious nonpolitical crime" within the meaning of section 1253(h)(2)(C). There must be a "'close and direct causal link between the crime committed and its alleged political purpose and object.'" *Id.* at 597 (quoting Guy S. Goodwin-Gill, *supra*, at 61). Additionally, the crime "should be considered a serious nonpolitical crime if the act is disproportionate to the objective, or it is 'of an atrocious or barbarous character.'" *Id.* at 595 (quoting Guy S. Goodwin-Gill, *supra*, at 61). Both strands of this suggested analysis are satisfied here.[44]

It is the official position of the United States Government that the PIRA is a terrorist organization. U.S. Dep't of State, *Patterns of Global Terrorism: 1986* at 33-34 (1988) & 1989 at 74-75 (1990) (identifying the

---

[43] This subsection, which was added to the Immigration and Nationality Act as part of the Refugee Act of 1980, Pub L No 96-212, § 203(e), 94 Stat. 102, 107, is based directly upon, and is intended to be construed consistent with, the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N TS 267, which incorporates by reference the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 *See McMullen v. INS*, 788 F.2d at 594-95.

[44] That respondent's extradition was denied on the grounds that the crime for which extradition was sought was a political offense under the Extradition Treaty then in force, *see Matter of Doherty by Gov't of United Kingdom*, 599 F Supp. 270 (S.D N.Y 1984), has no bearing on the instant inquiry, which is a matter of statutory interpretation of 8 U.S.C. § 1253(h)(2)(C) *See McMullen v INS*, 788 F.2d at 596-97.

23

*Terrorism: 1986* at 33-34 (1988) & 1989 at 74-75 (1990) (identifying the PIRA as a terrorist organization);[45] *see also McMullen v. INS*, 788 F.2d at 597 ("[t]he PIRA is unquestionably a 'terrorist' organization"). The INS has introduced substantial evidence that PIRA is a terrorist organization which commits violent acts against innocent civilians, *see Matter of McMullen*, 19 I & N Dec. 90 (1984). And the BIA has specifically found that the PIRA has engaged in "indiscriminate bombing campaigns, ... murder, torture, and maiming of innocent civilians who disagreed with the PIRA's objectives and methods." *Id.* at 99-100, *quoted in McMullen v. INS*, 788 F.2d at 597.

In my view, there is substantial evidence that PIRA has committed terrorist activities directed at innocent, civilian populations. *See McMullen v. INS*, 788 F.2d at 597 (substantial evidence exists that PIRA committed "terrorist activities directed at an unprotected civilian population"). These "random acts of violence" against civilians constitute "serious nonpolitical crimes" for purposes of 8 U.S.C. § 1253(h)(2)(C). *Id.* at 598.

As the court held in *McMullen*, 788 F.2d at 599, I need not determine that respondent committed any of these unprotected crimes against the civilian population. "We are unmoved by the pleas of a terrorist that he should not in any way be held responsible for the acts of his fellows; acts that, by his own admission, he aided ... and assisted ... and otherwise abetted and encouraged." *Id.*[46] I need only find that there is "probable cause" to believe that respondent committed such crimes. *Id.*

In *McMullen*, the court held that conduct remarkably similar to respon-

---

[45] *See also* 1 Pub Papers of Ronald Regan 751 (1984) (PIRA "has all the attributes of a terrorist organization"); 43 Cong Q. 1388, 1389 (1985) (address by President Reagan); 84 State Dep't Bull. 12, 13, 15 (Dec. 1984) (Sec Shultz) (U.S. joins U.K. and Irish government "in opposing any action that lends .. support to the Provisional IRA"), Staff of House Comm on Foreign Relations, 101st Cong , 1st Sess , Country Reports on Human Rights Practices for 1988 at 1236-37 (Comm Print 1989) (Reports submitted by Dep't of State) (PIRA admissions of terrorist activities); Affidavit of Assoc Att'y Gen. Stephen S. Trott, sworn to Feb 19, 1987, at para. 8 ("It is the position of the United States Government that the crimes committed by Doherty — hostage taking, murder, and assault with intent to commit murder — are terrorist offenses.").

[46] Under general principles of conspiracy law, a co-conspirator is chargeable with any criminal act committed by another co-conspirator in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946) Respondent's membership in the PIRA makes him a co-conspirator in the PIRA's effort to overthrow British rule in Northern Ireland by violent means, and hence responsible for any *nonpolitical* crimes his co-conspirators commit in pursuit of that objective. The "PIRA's random acts of violence against the ordinary citizens of Northern Ireland and elsewhere" are "exhaustively documented in the record" of the *McMullen* case. *McMullen*, 788 F.2d at 598 Moreover, the BIA has found that

the PIRA is a clandestine, terrorist organization committed to the use of violence to achieve its objectives . [and has engaged in] attacks on both government civilian institutions and military installations, random violence against innocent civilian populations through indiscriminate bombing campaigns, the murder or maiming of targeted individuals for political reasons based on their public opposition to the PIRA, and the use of violence to maintain order and discipline within the PIRA's membership. Its operations have been funded, in part, through the commission of thousands of armed robberies.

*Matter of McMullen*, 19 I & N Dec 90, 92 (1984) (citations omitted), *aff'd on other grounds*, 788 F.2d 591 (9th Cir. 1986) Based on these judicial and administrative findings, I of course have serious reasons to consider that PIRA members have committed serious nonpolitical crimes in the course of their conspiracy, and thus to conclude that respondent, as a co-conspirator, can be held responsible for committing crimes of such a character, even if he personally did not perform them.

dent's was sufficient to establish probable cause to believe that the petitioner had committed some of PIRA's unprotected nonpolitical crimes. The relevant passage bears quotation at some length:

> McMullen admits that he was an active member in the PIRA, that he trained its members and participated in unlawful arms shipments as well as bombings of military installations. With regard to the PIRA itself, there is no question that it has undertaken terrorist activities directed at civilian targets in a manner unprotected as a political offense. We conclude that the "totality of the circumstances," *cf. Illinois v. Gates,* 462 U.S. 213, 230, 103 S. Ct. 2317, 2328, 76 L. Ed. 2d 527, [543] (1983), which include McMullen's willing and material involvement in a terrorist organization that carried out acts of violence against civilians, his assistance in training members of that organization and procuring arms shipments, support the BIA's conclusion that there are "serious reasons" to believe that McMullen committed some of these unprotected, serious nonpolitical crimes.

788 F.2d at 599. Here, as with the petitioner in *McMullen,* there clearly is the requisite probable cause to believe respondent has committed unprotected crimes. Respondent is a longstanding, active member of the PIRA. *See* discussion *supra* pp. 1-2 and *infra* notes 47, 53. He has admittedly committed violent acts in furtherance of the purposes of the PIRA. Like the petitioner in *McMullen,* respondent has provided the PIRA with "the physical and logistical support" that enables this terrorist group to operate. 788 F.2d at 599.[47]

Respondent's membership and participation in, aiding of, and assistance to the PIRA is sufficient to constitute probable cause to believe that respondent has committed unprotected criminal acts, and therefore sufficient basis upon which to conclude that there are "serious reasons" to believe that respondent has committed "serious nonpolitical crimes."

---

[47] Respondent readily admits

> the facts that [he] was an "admitted member" of the Irish Republican Army, that he was convicted of the murder of a British Army officer and other violent offenses, that he and seven other IRA volunteers escaped from prison in Northern Ireland, and that he is currently the subject of outstanding warrants of arrest in the United Kingdom are, pursuant to the opinion [by Judge Sprizzo] in *Matter of Doherty,* matters of public information and readily available to all, including immigration judges.

Brief for Respondent-Appellee Joseph Patrick Thomas Doherty, *supra* note 25, at 3 (footnote omitted).

[48] Attorney General Meese noted in his June 9, 1988 opinion that violence against military personnel in a democratic society is unjustified, as is violence against civilians. *Deportation Proceedings,* 12 Op. O.L.C. at 6. Nothing herein is intended to suggest otherwise. It is not necessary for me to decide here whether violence against military personnel is alone sufficient to satisfy section 1253(h)(2)(C) because (1) respondent's other activities, together with his acts against British military personnel, are clearly sufficient, and (2) respondent's participation in violent acts against civilians is also alone sufficient.

25

*McMullen*, 788 F.2d at 598.[48] Indeed, this may even be a stronger case for application of the exception than in *McMullen*, given the record evidence that respondent committed a murder; smuggled large quantities of explosives in a car hijacked by a PIRA unit; drove to an ambush site in a hijacked van, the driver of which was held captive; and took over a family-occupied house in a civilian, residential neighborhood for the purpose of ambushing a British army patrol. *See* Transcript of Respondent's Testimony at 773-74, 783-86 & 792-96, *Matter of Doherty by Gov't of United Kingdom*, 599 F. Supp. 270 (S.D.N.Y. 1984) ("Doherty Transcript").[49] *Compare McMullen v. INS*, 788 F.2d at 592-93, 599.[50]

(b) Respondent also has "assisted, or otherwise participated in the persecution of ... person[s] on account of ... political opinion," rendering him ineligible for withholding of deportation under 8 U.S.C. § 1253(h)(2)(A). *See McMullen v. INS*, 788 F.2d at 600 (Goodwin, J., concurring). Respondent is a member of the PIRA, an organization that the BIA found has killed or attempted to kill those who politically oppose its activities.[51] Moreover, as a PIRA officer, respondent was admittedly responsible for distributing arms and gathering ammunition, Doherty Transcript, at 726, and he engaged in training and drilling other PIRA members. *Id.* at 734. These facts establish by ample evidence that respondent would be ineligible for withholding because of his participation in the PIRA's persecution of political opponents.

Again, it is not necessary for me to find that respondent was directly and personally involved in any of the PIRA's attacks on political targets. *See, e.g., McMullen v. INS*, 788 F.2d at 600 (Goodwin, J., concurring).[52] Respondent's active roles in arming and training the PIRA, coupled with his willing membership in that organization, the length of his service in it,

---

[49] As the dissenting opinion in the BIA decision below pointed out, "it is fortuitous that the civilian hostages [taken by respondent and his associates] were uninjured in view of the fact that they were ... exposed to a gun battle." *Matter of Doherty*, No A26 185 231, slip op. at 4 (BIA Nov. 14, 1988) (Morris, B M., dissenting)

[50] Apart from the *McMullen* analysis, I determine that there are "serious reasons for considering" the offenses indisputably committed by respondent, *see, e.g.*, discussion *supra* note 47, to be "serious non-political crimes" within the meaning of section 1253(h)(2)(C). These crimes standing alone involved disproportionate threats to civilian life and property.

[51] *See Matter of.McMullen*, 19 I & N Dec. 90 (1984) (PIRA engages in the murder or maiming of target individuals for political reasons based on their public opposition to the PIRA, among these targeted individuals was Ross McWhirter, founder of the *Guinness Book of Records*, for whose death the PIRA claimed "credit")

[52] *Cf. Kulle v. INS*, 825 F.2d 1188, 1192-93 (7th Cir. 1987) (almost identical language to 8 U.S.C. § 1253(h)(2)(A) held not to require proof of individual participation); *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir. 1986), *cert. denied*, 481 U.S. 1004 (1987) *See also United States v. Osidach*, 513 F Supp. 51, 72 (E D Pa 1981) ("[U]nder § 13 of the [Displaced Persons Act of 1948, Pub. L No. 80-774, 62 Stat. 1009], mere willing membership — without proof of personal participation in acts of persecution — in a movement that persecute[s] civilians is sufficient to warrant a finding of ineligibility [for admission into the United States] as a displaced person "), *but cf. Laipenieks v. INS*, 750 F.2d 1427, 1431 (9th Cir 1985).

[53] In his extradition trial, respondent testified.
I held several [PIRA] staff positions in Long Kesh [prison], from the section leader, company staff, officer's position. I was a company quartermaster, a company training officer, a com-
Continued

and the rank he attained,[53] more than suffice to show that he "assisted" the PIRA's political persecutions under the statute. Even if membership in the PIRA, standing alone, would be insufficient to bar respondent from relief under section 1253(h)(2)(A), *see Matter of Rodriguez-Majano*, 19 I & N Dec. 811 (1988), respondent's activities on behalf of the PIRA fairly implicate him in those persecutions.[54]

Additionally, section 1253(h)(2)(A) reaches persons who have "otherwise participated in" persecution, even if they have not "assisted" in the persecution. This broad language covers forms of collaboration that are not otherwise captured by the Act, and undoubtedly extends to respondent's activities.[55]

On either of the above bases, respondent is not entitled to withholding of deportation.

## Conclusion

For the foregoing reasons, the decision of the BIA is disapproved, and the respondent's motion to reopen these proceedings is denied.

Respectfully,
DICK THORNBURGH

---

[53] (...continued)
pany drill sergeant — well, we call them a drill officer. You call them in the United States Army drill Sergeants. I was in charge of the men in the yard and military formation, etc. After that I was a company — my God, I was everything — a company finance officer, and the highest rank that I have ever held inside the company was the company adjutant. I was the second in command of a company of 78 men.
Doherty Transcript at 734.

[54] Respondent reads *Rodriguez* to make the INS's persecution argument "frivolous." Respondent's Brief, *supra* note 11, at 27 n.19. But *Rodriguez* holds only that those who are members of opposing forces in a civil war are not ineligible for withholding of deportation or asylum as political persecutors if they inflict harms arising as the natural consequence of civil strife (*e.g.*, burning automobiles). The instant case, however, involves a terrorist group's particularized attempts to destroy targeted civilian political opponents.

[55] General principles of conspiracy law again underscore this conclusion. *See supra* note 46. The statute's broad reference to those who "otherwise participate" in political persecutions is fairly read to encompass those individuals whose co-conspirators engage in political persecutions in furtherance of the conspiracy.

27

# OPINIONS

OF THE

# OFFICE OF LEGAL COUNSEL